ERNST PRIEGER, PAUL C. FACE and JACOB HUBE,
Appellants

*vs.*

THE EXCHANGE MUTUAL INSURANCE COMPANY,
Respondent.

APPEAL FROM MILWAUKEE COUNTY COURT.

The court will take judicial notice of the relative situation of the sections and quarter sections of land, according to the government surveys.

The same rule of construction applies to policies of insurance as to all other contracts, i. e., to ascertain the intention of the parties, by giving the language employed by them its usual and ordinary signification and meaning.

The representation contained in the description of the insured premises, and which became a part of the policy—that the premises *are constantly worked*—is to be understood as a representation that the premises were to be constantly worked during the usual and customary working days and hours, for the prosecution of the business for which they were employed.

This was an action of assumpsit, brought by Ernst Prieger, Paul C. Face and Jacob Hube, plaintiffs, against The Exchange Mutual Insurance Company, defendant, to recover the amount of loss sustained by the plaintiffs by the burning of their paper mill, which was insured by the defendant in the sum of fifteen hundred dollars.

The declaration contained a special count upon the policy of insurance, which was in the usual form, and also the common money counts. The defendants pleaded the general issue.

The cause was tried to a jury on the 16th day of December, 1856, when the plaintiffs introduced in evidence the policy of insurance, which contained the following clause: " It is also " declared that this policy is made and accepted in reference " to the written and printed application whereon it is issued, " and also to the conditions hereto annexed, which are hereby

"made a part of this policy, and to be used and resorted to "in order to explain the rights and obligation of the parties "hereto, in all cases not herein otherwise especially provided "for, and it is also agreed and declared by the parties afore- "said, that no condition, stipulation, covenant or clause here- "in before contained, shall be altered, annulled or waived, or "any clause added to these presents, except by writing endors- "ed hereon or annexed hereto by the president or secretary, "with their signatures affixed," &c.

Among the "conditions" annexed to the policy, and, by the above clause, forming a part thereof, are the following:

"CONDITIONS OF INSURANCE."

"1st. Applications for insurance on property shall specify "the construction and material of the buildings to be insured, "or containing the property to be insured, by whom occupied, "whether as a private dwelling or how otherwise, its situation "with respect to contiguous buildings and their construction "or materials; whether any manufacturing is carried on with- "in or about it; and such description or specification shall be "deemed a part of the Policy, and a warranty on the part of "the insured. When desired, the assured shall permit this "Company or their agents, to examine the premises hereby "insured. A refusal of this privilege will make void this "policy.

"If any person insuring any building or goods in this Com- "pany, shall make any misrepresentations or concealment, or "if, after the insurance is effected, either by an original policy "or by a renewal thereof, the risk shall be increased by any "means whatever, or if such buildings or premises be occu- "pied in any way, so as to render the risk more hazardous "than at the time of insuring, such insurance shall be void "and of no effect. If at any time, during the insurance, the "risk be increased by the erection of buildings, or by the use "and occupation of neighboring premises or otherwise, or if "at any time, the Company shall so elect, it shall be optional "with the Company to terminate the insurance, after notice

" given to the insured or his representatives of their intention " to do so; in which case the Company shall refund a ratable " proportion of the premium."

The plaintiff also offered and read in evidence, the application of the plaintiffs for insurance, mentioned in said conditions, which contained the following clauses:

" Application of Ernst Prieger & Co., of the town of Wauwautosa, county of Milwaukee, State of Wisconsin, for insurance against loss or damage by fire, by the Exchange Mutual Insurance Company, in the sum of fifteen hundred dollars, for the term of one year, commencing the third day of January, 1856, at noon, on the property specified, to wit:

|  | Sum to be Insured. | Valuation. | Rate of Premium. |
|---|---|---|---|
| On their paper mill, | $1500 | $5000 | 3 per cent. |

The applicant will answer the following questions and sign the same as description of the premises on which the insurance will be predicated.

1. Name of premises and where situated.

1. Prieger's Paper Mill, situated N. E. qr. of Sec. 26, Town 7, Range 21.

2. What kind of goods are made and of what material? Are wood shavings made on the premises?

2. Wrapping paper; of straw and rags; no wood shavings made on the premises.

3. Is the building stone, brick or wood; and of what material is the roof? Size, number of stories, and how finished within?

3. Wood and shingles. 20 x 80 feet, 2 1-2 stories, addition 12 x 18, and 9 feet high.

When built.

Rebuilt this year.

*" During what hours are the premises worked? By what power propelled? If by water, is the supply sufficient.*

*The premises are constantly worked. Propelled by water power. Supply sufficient.*

10. Is a watch kept on the premises during the night? Is there a good watch clock?

10. *No watch kept except people working in the mill during the night."*

" And the said applicant hereby covenants and agrees to, and with the said Company, that the foregoing is a just, full and true exposition of all the facts and circumstances in regard to the condition, situation, value and risk of the property to be insured, as far as the same are material to the risk."

The counsel for the plaintiff then called Hiram F. Story who being duly sworn as a witness, on the part of the plaintiff, testified as follows, viz :

I am acquainted with the plaintiffs. I know their paper mill ; situated in the town of Wauwatosa, near the Menominee river, on the south side of the Spring Street road ; it was near the Milwaukee and Mississippi railroad. My house is about fifty rods from the paper mill. I cannot say as the building was on the N. E qr. of Sec. 26. The water to drive the mill is taken from the river on the N. E. qr. of Sec. 26. I think the mill was in the S. W. qr. of Sec. 25. The mill was destroyed by fire in the month of April last (1856.) I made an estimate on the value of the mill in connection with Andrew Eble. Mr. Eble resided about half a mile from the mill. He resides on the N. E. qr. of Section 26. The value of the mill at the time it was burned was from four thousand to five thousand dollars. P. J. Shumway was then a justice of the peace and the magistrate nearest to the mill.

Being cross examined by the defendant's counsel he said : I think it would have been worth about two thousand dollars to erect the building. I state this without making any estimate. It would overrun rather than fall short. The mill burned in the latter part of the night. My attention was called to it about four o'clock in the morning. I got up and went down to the mill immediately, and when I arrived there the building was all or nearly all burned down. At that time some two or three of the workmen were there. Face was there, and Hube was also there. Am not certain whether Prieger was there or not ; I think he was there. When I arrived there it was too late to do any thing. I have no knowledge of the origin of the fire. I am not positive that I heard the plaintiffs say how the fire originated. In my estimate of the value of the mill I do not include any thing in the building. The fire was on Monday morning.

*Direct examination resumed*—I estimate the mill and machinery now at thirty-five hundred dollars and upward. Mr. Eble

and myself both own real estate in the vicinity in the town of Wauwatosa."

It was here admitted without other proof, that Albert Bade was agent for defendants at the City of Milwaukee at the time of making the policy, and that he has continued such agent until the time of trial. And that notice of the fire was given by the plaintiffs forthwith, and that preliminary proofs of the loss as required by the conditions of insurance annexed to the said policy were delivered by the said plaintiffs to the said Bade, agent for defendants, on the 25th day of April, A. D., 1856. Copies of all which preliminary proofs of loss were read in evidence by consent and without objection, to show that the plaintiffs made the preliminary proofs of loss called for by the terms of the policy and only for that purpose.

Frederick Gumbe, sworn, says : I am acquainted with the plaintiffs. I was employed by them to attend the engine at their paper mill. I was employed by Prieger & Co. The mill was on the Spring Street road, near where it crosses the railroad. I remember when the mill was burned. It was on the 20th of April last, on the night of Sunday or on the morning of Monday, the 21st of April. I had been employed in the mill from the 1st of March preceding to the time the mill was burned down. The mill was owned by the plaintiffs, Prieger, Face & Hube. I was in the mill the night before it burned. I remained there during the evening, and left the mill at 11 o'clock in the night. The mill was not left running. We stopped work at the mill at six o'clock in the evening. They had too much stock on hand, and the air was too damp to dry the paper, and so we could not work the mill. The dryers were full of paper and the paper was not dry, and had so much pulp prepared that we could not go on. We had no place to put away any more paper, and stopped the mill because we had no place to put away any more. That sometimes happens to all paper mills, but not very frequently. There was no fire in the mill when I left it. There was no fire in any stove in the mill from noon on Sunday to the time I left the mill that night. There were some fishermen on the

river that night with fires; they were two or three hundred feet from the mill. The river was two hundred and fifty feet from the mill. The river is east from the mill. I locked the doors of the mill when I left that night. I went to the house near the mill where I slept, about thirty paces. Prieger lived in his brick house, on the railroad one fourth of a mile from the mill. Face and Hube lived in the same house with Prieger. There were two Americans who slept in the same room with me. I first discovered the fire about three o'clock in the morning. I got up and went out and the mill was burning. The roof and highest story were burning. The mill was destroyed by fire. When I got to the mill there was no one there but fishermen. I saw two fishermen there. They were near the mill on the side of Spring Street road. They remained there and assisted some to save such things as could be saved out of the fire. I don't know their names. I don't know how the fire originated. Nearly the whole upper part was burning when I saw it. The part nearest the railroad was not burning when I first saw the fire. There was no steam boiler on the premises. The engine I spoke of is driven by water; it was not a steam engine, but the machine that ground the rags and materials to make paper.

On his cross examination he said : We worked the mill on Sunday until six o'clock, P. M. It was customary to work the mill nights; all night; every night; and Sunday. We had not failed to work the mill all night, every night before the night it burned. I remained in the mill reading, to watch the mill. The teamster was with me until 10 1-2 o'clock. The teamster was sitting by me doing nothing. Neither of us smoked during the evening. We were not in the habit of smoking in the mill. It was not allowed to smoke in the mill. I never saw any one smoke in the mill. It was not customary to drink in the mill. The workmen were not in the habit of drinking in the mill. There was no rule against it, but we did not do it. No one drank then in the mill. I locked the door at eleven of that night, and no one could have been in the mill between 11 o'clock that night and 3 o'clock in the morning,

unless they broke the door in. I had an oil lamp to read by. Face was there until near ten o'clock. Prieger was there in the forenoon. Hube was there in the afternoon, and then he went home. When Face left at ten o'clock the teamster was not there. The teamster came after Face left. Since I was employed there I don't recollect that they failed to work. They worked there all the time. Can't say how the fire originated. Don't know who gave the alarm that called me out, but think it was the sister of the millwright. I went directly to the mill. Two fishermen came to the mill at the same time I did. Myself and the two fishermen were the first persons who came to the mill after the fire broke out. I endeavored to save the millwright's tools. When I came to one door it was opened, and the other one was locked. That door had apparently been broken open. I went to this door before the fisherman did. The house in which I slept was thirty feet south of the mill. The fire appeared first in the highest story, where the paper was hung to dry. I think the railroad is about thirty feet from the mill.

The counsel for the plaintiff here rested his case, and thereupon the said defendant, by their counsel, did insist, that on the evidence the said plaintiffs were not entitled to recover, and moved for a non-suit upon the following grounds, viz:

1st. That the evidence does not show that the said mill was situated on the North East quarter of Section twenty six, as described in the application.

2d. That the application for insurance contained a warranty on the part of the assured, that the mill should be constantly worked during the continuance of the risk, and that it appears from the evidence that it was not so worked.

3d. That the plaintiffs stipulated that a watch should be kept in the mill by their answers to interrogations nine and ten, contained in the application, and that no watch was kept after eleven o'clock on the night the mill was burned.

The county judge sustained the motion and rendered judgment for the defendant for costs, to reverse which the plaintiffs appealed.

*H. L. Palmer*, for the appellant.

The principles which govern the construction of insurance contracts, do not vary from those which are applicable to all other mercantile instruments. 1, *Arnold on Insurance*, 64 *; Potter vs. the Ontario and Livingston M. Ins. Co.*, 5 *Hill*, 147. The *mutual intention* of the parties is the great object of enquiry. To seek that out and give it effect, is the object of the law and the office of the Court. The true rule to be applied is believed to be that laid down by Lord Ellenbrough in *Robertson vs. French*, 4 East, 135, viz: "It (the contract) is to be construed according to the sense and meaning as collected in the first place from the terms used in it, which terms *are to be understood in their plain, ordinary and popular sense*," unless the words used have acquired a peculiar sense, or unless the context indicates that to effect the intention of the parties, they must be understood in "some other special and peculiar sense."

I. The first objection to the plaintiffs' right to recover, is based upon the first interrogatory contained in the application and the answer to it. The applicant is required to state the "name of the premises and where situated." The answer is "Prieger's Paper Mill, situated N. E. qr. Sec, 26, Town 7, R. 21." It is said that the evidence disclosed the fact that the mill was not on the N. E. qr. of Sec. 26, but was on the S. W. qr. of Sec. 25.

Whether the ground on which the mill stood was really in the north-west corner of the south-west qr. of Sec. 25, or the south-east corner of the north-east qr. of Sec. 26, did not in any degree affect the risk, and could have been of no possible consequence to the defendant. But the entire application is to be taken and construed together; and being so construed, the diagram, which was a part of the application, exhibited the actual location of the premises. The description was inserted in the application by the defendant's agent and, as describing the land on which the mill stood. If it is wrong, it is the wrong of the defendant, which ought not to be allowed to

affect the plaintiff's right. *Masters vs. Madison Mut. Ins. Co.* 11 Barb. 86, R. 624.

II. It is claimed that the answer to a portion of the ninth interrogatory constitutes a warranty that the mill was to be worked constantly, *during the continuance* of the *risk*. And as to this point the whole question turns upon the construction to be given to the interrogatory, "*During what hours are the premises worked?*" and the answer "*the premises are constantly worked.*" Applying to this language the rules already referred to, what was intended by the language here used? The object of the insurance company was to ascertain what number of hours the mill was worked in order to graduate the premium to be charged for insurance. The more the mill was worked the greater the risk, and if it was operated during the night as well as during the day, the risk would be greatly increased.

The plaintiffs in answering, give the required information, and by their answer, seek to secure to themselves the right to operate the mill by night as well as by day, and the contract of insurance, so far as it was based upon the interrogatory and answer in question, was undoubtedly understood and intended by both parties, to secure to the one the right of operating the mill by night, and to the other the extra premium to which it was fairly entitled for the privilege so granted. And it would be giving to the language used, a forced and exceedingly strained construction, to hold that the information given in answering the interrogatory reduced the rate of premium; that the working of the mill by night was a favor to the company for which it stipulated, and that the plaintiffs bound themselves to operate the mill all the time, every hour during the continuance of the risk.

Again; "when the terms of a promise admit of more senses than one, the promise is to be performed in that sense in which the promisor apprehended that the promisee received it." See Dr. Paley's Rule cited in Potter vs. Ontario and Livingston Mutual Insurance Company, 5 Hill 149. And the same rule substantially is laid down by Chancellor Kent. "The true

principle of sound ethics is to give to the contract the sense in which the person making the promise believed the other to have received it." 2 Kent's Com. 557.

If the language in question might be construed as an agreement or warranty on the part of the plaintiffs, that they would operate the mill *all the time* during the continuance of the risk; it is also susceptible of the construction we have already claimed for it. And it is also susceptible of this other construction, that the plaintiffs intended only to say that the mill was "*constantly worked*" during, ordinary business hours, and on ordinary working days, when not prevented by accident, or other untoward circumstances. And applying the rule cited above and giving to the language the sense in which the plaintiffs themselves understood it and in which they believed the other parties to have received it, it can hardly be said that the plaintiffs understood, or believed that the company understood, that by the answer given to the ninth interrogatory, the plaintiffs engaged their mill at all times, at all hours, and on all days and nights during the continuance of the risk, and that if the "premises" ceased to be worked at any time to repair machinery, to repair a dam carried away by a flood—for the temporary want of some one of the articles used in the manufacture of the paper—because one part of the business of manufacturing had been advanced so far that it must wait a time for another part of the work, because as in this instance, all the paper had been worked into sheets and put up to dry which the dryers would hold, and it would not dry on account of the state of the atmosphere, as fast as the mill prepared it, or because it was Sunday; they thereby violated their contract and forfeited all right to the indemnity for which they had paid; and which the defendant had agreed to give them. *O'Neil vs. Buffalo F. Ins. Co.* 3 Comst. 122. *Dobson vs. Sotheby,* 1 M. & M. 90, 22 E. C. L. 260. *N. Y. Eq. Ins. Co. vs. Langdon,* 6 Wend. 623, 2 Hall 226, 1 Sumner 435, 1 Seld. 469, 6 Adolp. & E. 75, 33 E. C. L. 12.

III. The third objection to the plaintiff's right to recover is based upon the tenth interrogatory and the answer.     Here

too, the interrogatory is designed to ascertain if a regular watch is kept on the premises in order to regulate the premium to be charged. The answer is designed to give and does give the information that *no watch is kept*, that *no man* is employed for that purpose. It is not an engagement on the part of the plaintiffs to keep people working in the mill for the purpose of watching it, but only indicates that there was no watch kept except people working in the mill, and only when the employees were at work.

*Butler*, *Buttrick*, *and Cottrill* for respondent.

I. The *survey* or *application* for insurance furnished by the appellants in this case to the appellee, before the policy was executed, was made, by the express terms of the policy of insurance, a warranty on the part of the appellants; and, as such warranty was not complied with, the policy was void.

A *warranty* on the part of the assured, whether express or implied, is in the nature of a *condition precedent*, and must be strictly complied with, or the policy is void; not so as to a *representation*, in respect to which the rule is, that the policy is valid unless the representation is false in a matter *material to the risk*.

*The Farmers' Ins. and Loan Co. vs. Snyder.* 16 Wen. R. 481.

The description of the property insured, in a policy of insurance, is a warranty that the property is as described; and if untrue, in substance, the policy is void, though the mis-description arise from mistake, and there be no fraud. Thus, where a policy described the subject insured as a stock in trade contained in a two-story frame house, *filled in with brick*, No. 152 Chatham street—the house being a frame house *not filled in with brick*—held that the policy was void.

*Fowler et al. vs. Ætna Ins. Co.*, 6 Cow. R. 673.

II. The distinction between a representation and a warranty is well established: a representation is *collateral to the contract*, and its controlling power in the determination of the rights of the parties is governed by the circumstance of *fraud, materi-*

*ality to the risk* and other considerations, and is answered by a *substantial performance;* while a warranty is of the essence of the contract of insurance, in itself absolutely decisive of the rights of the parties, and must be *literally fulfilled.*

It is perfectly immaterial for what purpose a warranty is introduced; but being inserted, the contract does not exist unless it be literally complied with.    *De Hahn vs. Hartley,* 1 D. & E. 343.

The proposals and conditions attached to the policy form a part of the contract, and have the same force and effect as if contained in the body of the policy, and it is not requisite that such conditions or warranties should be material to the risk; in this respect an express warranty is distinguished from a representation.    *Duncan vs. Sun Fire Ins. Co.,* 6 Wen. R. 488.

Lord Eldon says : " It is a first principle in the law of insurance, that if there is a warranty, it is a part of the contract that the matter is such as it is represented to be.    The materiality or immateriality signifies nothing.    The only question is as to the mere fact."    *Worsley vs. Wood et al.*    6 D. & E. 710.

III. Statements in the *application,* when that is made part of the policy, of the purpose for which the property insured is to be occupied, and of its situation as to other buildings, are warranties, and if untrue, the policy is void, though the variance be not material to the risk.    *Jennings vs. The Chenango M. Ins. Co.*    2 Denio R. 75.

IV.  In this case the *application* was, in and by the policy, expressly " *declared to be a part of this policy, and a warranty on the part of the assured..*"

The assured were furnished by the underwriters with a blank application, containing sixteen *printed* questions, to be answered by the assured, and which were answered in writing by them ; and among the questions and written answers thereto, by the assured, were these :

" 1.  Name of premises, and where situated ?"    *Ans.* " Prie-

ger's Paper Mill, situated on N. E. quarter of section 26, Town 7, Range 21."

"9. During what hours are the premises worked? By what power propelled? If by water, is the supply sufficient?" *Ans.* "The premises are *constantly* worked—propelled by water power—supply sufficient."

"10. Is a watch kept upon the premises during the night? Is there a good watch clock?" *Ans.* "No watch kept, except people working in the mill *during the night.*"

The evidence on the trial showed clearly that the mill insured was situated on the *south-west* quarter of section 25, town 7, range 21—and not on the *north-east* quarter of section 26, in said town and range as stated in the application; and it also clearly appeared in evidence, and was not disputed, that the mill was destroyed by fire on the 20th of April, A. D. 1856, at about 3 or 4 o'clock on Monday morning; that from the time the policy was issued until about 6 o'clock in the afternoon of the Sunday before the destruction of the mill, it had been *constantly* worked, day and night, Sundays and week days, and that the work had not been discontinued at all until about 3 o'clock on the evening before the fire; that there was no fire in the mill after 12 o'clock M. on Sunday, and that at about 11 o'clock in the evening, the mill was locked up and left without any person in it, for the space of about four hours, and until the fire broke out; and the person who first arrived at the mill, at the time of the fire, discovered that the door had been *broken* open.

See the authorities cited above, and also the case of Houghton and another vs. The Manufacturers' Mutual Fire Insurance Co. 8 Metcalf 114—which is similar, in many respects, to this case.

*By the Court,* SMITH J.—It is insisted on the part of the respondents, that the "survey" or "application" furnished by

the appellants for insurance, and the description of, and statements in regard to, the premises, were made, by the express terms of the policy, a warranty on the part of the appellants; and contended that if such warranty was not complied with, the policy was void; that if such statements or any of them are untrue, by mistake or otherwise, whether material to the risk or not, the policy is void.

Among the conditions for insurance contained in the policy is the following:

" 1st. Applications for insurance on property shall specify the construction and material of the buildings to be insured, or containing the property to be insured, by whom occupied, whether as a private dwelling or how otherwise, its situation with respect to contiguous buildings, and their construction or materials; whether any manufacturing is carried on within or about it; *and such description or specification shall be deemed a part of the policy, and a warranty on the part of the insured.* When desired, the assured shall permit this company, or their agents, to examine the premises hereby insured. A refusal of this privilege will make void this policy."

The printed " survey " or " application " contained a column of interrogatories separately numbered, to be answered by the applicant in writing in a column opposite that containing the interrogatories and numbered appositely. The first is as follows: Name of premises, and where situated. 1. Prieger's Paper Mill, situated N. E. qr. of sec. 26, town 7, range 21, * * 9. How are the several stories occupied? During what hours are the premises worked? By what power propelled? If by water, is the supply sufficient? *Ans.* 9. One and a half for machinery one for drying paper. The premises are constantly worked. Propelled by water power. Supply sufficient.

10. Is a watch kept upon the premises during the night? Is there a good watch clock? 10. *Ans.* No watch kept except the people working in the mill during the night.

It will be seen that the whole defense is based upon the answer to these 1*st*, 9*th* and 10*th* interrogatories, and it is contended that by the terms of the policy they are made warran-

ties, and if untrue or incorrect the plaintiff cannot recover, whether material or not; that they are in the nature of conditions precedent, and must be shown to be correct and strictly fulfilled, or the policy is void.

It is further contended that the answer to the first interrogatory is shown to be untrue, in regard to the situation of the premises; the proof showing them to be on the S. W. qr. of sec. 25. The witness, Storey, testified, that he could not say, as the building was on the N. E. qr. of sec. 26, that the water to drive the mill was taken from the N. E. qr. of sec. 26. He thought the mill was on the S. W. qr. of sec. 25.

Now if the correctness of this description was in the nature of a condition precedent, it is contended that this condition must be complied with before the plaintiff could recover, whether material or not.

We apprehend, however, that the counsel for defendant have overlooked one important provision in the policy, or rather the survey and application, which is expressly made a part of the policy.

The scope and effect of these answers are particularly defined at their close, and before being signed by the applicant, as follows:

"And the said applicant hereby covenants and agrees to, "and with the said company, that the foregoing is a just, full "and true exposition of all the facts and circumstances in re- "gard to the condition, situation, value, and risk of the prop- "erty to be insured, *as far as the same are material to the* "*risk.*"

(Signed,) "E. PRIEGER & CO.,
"Applicants."

It is supposed that the court will take judicial notice of the relative situation of the sections and quarter sections of land according to government survey; and that the S. W. qr. of sec. 25 corners upon the N. E. qr. of sec. 26, and that if the water to propel the mill was actually upon the corner of the S. W. qr of sec. 25, it could not in any degree be *material to the risk.* Besides, the the testimony of Kluppack shows that if

there was an error or mistake herein, it was the fault of the agent of the company, and not of the plaintiff. But it is entirely immaterial.

It will be observed that the authorities cited by the defendant do not apply to this case, as the parties here have expressly limited their covenants, warranties and representations to matters material to the risk.

Keeping this point in view, we shall proceed to examine the nature, extent and effect of the answers to interrogatories 9 and 10, as these are the only remaining objections to the plaintiff's recovery.

It is contended by the defendant's counsel that the answer of the plaintiff to the 9th interrogatory, was a warranty that the mill should be worked all hours, day and night,—Sundays as well as week days. The question is: "During what hours are the premises worked? By what power propelled? If by water, is the supply sufficient?" The answer is: "The premises are constantly worked. Propelled by water power. Supply sufficient."

Now the same rule of construction applies to policies of insurance as to all other contracts, and that is to ascertain the intention, meaning and understanding of the parties, and carry out the contract accordingly. What then did the parties understand by the answer of the assured, that the *premises* were constantly worked? Evidently that the process of making paper in some of its stages was constantly going on at all reasonable and lawful times. They did not understand that the water wheels were continually in motion, that the pulp was continually in the grinding, that the machinery was always in motion; but that the "*premises*" were constantly used for the purpose of manufacturing paper. The process of drying is as essential as that of grinding the pulp, and that process was going on, on the premises at the time of the fire.

Again, the mill was burned during Sunday night. It cannot be seriously contended that the foregoing answer implied an agreement to work the mill on Sunday. An unlawful act is never to be presumed or implied. It can only be inferred

from this language that the parties understood that the mill or premises was to be constantly worked, during the usual and customary working days and hours, for the prosecution of like business

This is rendered more clear by the next question, and answer thereto : "Is a watch kept upon the premises during the night? Is there a good watch clock ?" *Ans.* "No watch kept except people working in the mill during the night."

Here is a distinct statement by the assured that he kept no watch at all, except when people were working in the mill during the night. In other words that the only watch to be depended upon was that which resulted incidently from the observation of workmen when they were engaged on the premises in the night time. At other times there is no watch. There is no engagement or undertaking to keep men at work during the night time. Indeed there is no agreement to run the machinery nights, unless the manufacture required it.

On the whole we are unable to discover any violation of any of the covenants on the part of the assured "material to the risk," and therefore think the plaintiff ought to have recovered below. The court therefore erred in nonsuiting the plaintiff, and the judgment must be reversed.

Judgment reversed.