STATE OF IOWA, Appellant, v. WILLIAM BEARDSLEY.

**Dams: CONSTITUTIONAL LAW.** Laws Seventeenth General Assembly, chapter 188, which provide that the owner or owners of any dam or obstruction across any water course in this State shall within a reasonable time construct and maintain over and across said dam a fish way which will afford a free passage for fish up and down and through said water course, and that any dam not so provided within a reasonable time shall be abated as a public nuisance, is not, as to one who owns on both sides of a stream, and who has maintained a dam there for twenty-three years, unconstitutional, as depriving him of his property without due process of law; nor does such act constitute a taking of private property for public use without just compensation.

POLICE POWER. The requirement by the legislature that dams across streams shall be so constructed as not to interfere with the passage of fish is a legitimate exercise of the police power of the state,

NUISANCE. It is the province of the legislature, within the fundamental limitations upon its authority, to prescribe what shall constitute a nuisance

PRESCRIPTION. By maintaining a dam for twenty years the owner does not acquire a prescriptive right, as against the power of the state to compel the erection of fish ways.

Practice: CHALLENGING AUTHORITY OF ATTORNEY. Code 1873, section 214, which provides that the court may, on motion of either party to an action, require the attorney for the adverse party to produce or prove the authority under which he appears, and, until he does do so, may stay all proceedings by him in behalf of those for whom he assumes to act, provides the exclusive method of testing the authority of attorneys; and such authority may not be assailed by answer.

PLEADING AND PROOF. An allegation in an answer setting up a lack of authority on the part of the attorneys to commence the action is an affirmative defense, and is denied by operation of law, and the action would not abate until such want of authority was proven.

*Appeal from Mahaska District Court.*—HON. A. R. DEWEY, Judge.

TUESDAY, MAY 16, 1899.

THE defendant is the owner of about one hundred acres of land, through which flows Skunk river. The defendant is now, and has been for some years, maintaining a dam across said river, on his premises, in a way to obstruct the free passage of fish up and down said river; and he has neglected, and still neglects and refuses, to construct and maintain over or across said dam a fishway for the passage of fish up and down said river. This action is brought to have said dam adjudged a nuisance and have the same abated. The issues present several propositions, which will be noticed in the proper connection. The district court gave judgment for defendant, and the state appealed.—*Reversed.*

*Milton Remley,* Attorney General, *James Carroll, B. W. Preston,* and *J. F.* and *W. R. Lacey* for the State.

*L. C. Blanchard* for appellee.

GRANGER, J.—I. The action was commenced in September, 1895, by the filing of the petition, signed "Carroll, Lacey, and Preston, attorneys for plaintiff." The answer was filed October 1, 1895, and one division of it is that "the parties commencing this action have no right or authority to commence or prosecute this action, that they have no power or authority to represent the state, and that this action can only be prosecuted by the attorney general or other proper state officers." The point is now urged in argument. It is not doubted that the state is the proper party; the controversy being as to the attorneys who first appeared for the state,—the thought being that the attorneys are the parties prosecuting. The question, it seems to us, must turn on whether the attorneys have authority to appear, as such, for the state; and whether they have such authority or not is a question of fact, for, as the averment is in the answer, in the nature of an affirmative defense or plea, it is denied by the operation of law, and before the suit could be abated for want of such authority, the fact must be made to appear, and no further attention seems to have been given the question. We must say, however, that it is doubtful if a suit could be abated, or even delayed, by such a presentation of the question of the authority of the attorneys to bring suit in the name of a party, because of a specific provision of the Code of 1873, under the provisions of which this proceeding was commenced and tried. Section 214 of that Code is as follows: "The court may, on motion for either party and on the showing of reasonable grounds therefor, require the attorney for the adverse party or for any one of the several adverse parties, to produce, or prove by his own oath or otherwise, the authority under which he appears, and, until he does so, may stay all proceedings by him on behalf of the parties for whom he assumes to appear." We think this statute is designed as the exclusive method of testing the authority of attorneys to

appear in behalf of clients. It is also to be said that the attorney general afterwards appeared in the case, and is now of counsel for state.

II. The following are provisions of chapter 188, Laws Seventeenth General Assembly: "The owner or owners of any dam or obstruction across any river or stream, pond, lake or water course in this state, shall, within a reasonable time, erect, construct and maintain, over or across said dam or obstruction, a fishway of suitable capacity and facility to afford a free passage for fish up and down through said water course when the water of said stream is running over the dam." "Any dam or obstruction mentioned in section 1 of this act, not provided with such a fishway within a reasonable time after the taking effect of this act, is hereby declared a nuisance, and may be abated accordingly."

It is said by appellee that the defendant and his grantors have owned the land and maintained the dam for more than twenty-three years, and that the act above quoted is unconstitutional, in that it deprives the defendant of his property without due process of law, and also because private property is taken for public use without just compensation. The question of the constitutionality of such laws is not a new one in this country. It may be conceded that the authorities on the question are not without conflict. Whether or not the law contravenes either provision of the constitution depends on whether the acquisition of rights by the purchase of the land and the erection of the dam was without a reservation by the public to legislate in respect to the preservation of fish by the passage of such a law. The rights of the riparian owner on unnavigable streams is a subject that has been much considered by the courts, and in some respects the conclusions are harmonious, such as to the use of the water, and the exclusive right to take fish from the stream on his own land; it being the law that such an owner, if owning on both sides, has title to the banks and the bed of the stream, and, if the

stream is the boundary, then to the center thread of the stream. It is well-settled law that one riparian owner has not the right to so use the stream as to unreasonably deprive other riparian owners of rights common to all. It has ever been the law that riparian owners, when taking title from the public, do so with limitations in the public interests. They do not own the stream, but, by virtue of ownership of the soil, have the right to use the water passing over or through it, with limitations on such use. These limitations are to protect what have always been regarded as public rights or interests. Streams flowing through the country are not alone the heritage of riparian owners. They pass over and along our public highways, and through our cities and towns where the general public have access to them, and have rights in relation thereto that no one would think of questioning. These rights so pertain to the public health, convenience, and comfort, that the cause of their loss by personal interference would amount to a public nuisance. Fish and game are so related to the public welfare that they have, time out of mind, been the subjects of legal control, and their preservation has been very generally a matter of legislative concern. Chapter 15 of title 12 of our present Code is a practical illustration of legislative thought on the subjects of fish and game,—as to the public interest therein and their utility. The laws, if enforced, are a manifest abridgment of otherwise legal rights of the owners of the soil in taking fish and game thereon, and, except perhaps as to specific details, they meet with universal approval. These considerations are valuable in considering the inherent right of the owner of the soil to so use it as to impair such a public interest. In *Com. v. Essex Co.*, 13 Gray, 249, Chief Justice Shaw used this language: "It seems to be well settled that the obstruction of the passage of the annual migratory fish through the waters and streams of the commonwealth is not an indictable offense at common law; but the right to have these fish pass up the rivers and streams, to the head waters

thereof, is a public right, and subject to regulation by the legislature." Because of the court from which it emanates, we copy from an opinion by the supreme court of the *United States in Holyoke Co. v. Lyman,* 15 Wall. 500, as follows: "Rivers though not navigable even for boats or rafts, and even smaller streams of water, may be, and often are, regarded as public rights, subject to legislative control, as the means for creating power for operating mills and machinery, or as the source for furnishing a valuable supply of fish, suitable for food and sustenance. Such water power is everywhere regarded as a public right, and fisheries of the kind, even in waters not navigable, are also so far public rights that the legislature of the state may ordain and establish regulations to prevent obstructions to the passage of the fish, and to promote the usual and uninterrupted enjoyment of the right by the riparian owners. Proprietors of the kind, if they own both banks of the water course, and the whole soil over which the water of the stream flows, may erect dams extending from bank to bank to create power to operate mills and machinery, subject to certain limitations and conditions, and may also claim the exclusive right of fishery within their territorial limits, subject to such regulations as the legislature may from time to time ordain and establish. Persons owning the whole of the soil constituting the bed and banks of the stream are entitled to the whole use and profits of the water opposite their land, whether the water is used as power to operate mills and machinery or as a fishery, subject to the implied conditions that they shall so use their own right as not to injure the concomitant right of another riparian owner, and to such regulations as the legislature of the state shall prescribe." In *Weller v. Snover,* 42 N. J. Law, 341, the same quotation is made from Chief Justice Shaw, and the case of *Holyoke v. Lyman* is cited, and the syllabus states, "The state has the right, by legislation, to protect fish in rivers and streams not navigable." As early as 1808 the supreme court of Massachusetts announced

the law that: "Every owner of a water mill or dam holds it on the condition, or perhaps under the limitation, that a sufficient and reasonable passageway shall be allowed for the fish. The limitation, being for the benefit of the public, is not extinguished by any inattention or neglect in compelling the owner to comply with it." *Inhabitants of Stoughton v. Baker,* 4 Mass. 522. The case of *Parker v. People,* 111 Ill. 581, is a somewhat full consideration of the question, with an elaborate dissenting opinion by one of the justices; so that the case may be said to have received careful consideration. The statute of that state is so nearly like ours as to make the case entirely applicable. In that case the unconstitutionality of the law was urged upon the same grounds as in this case. The case has a somewhat more extended quotation from *Inhabitants of Stoughton v. Baker* than we have made, and gives full sanction to the rule, upon a review of the English as well as the American authorities. In 1822, in *Hooker v. Cummings,* 20 Johns. 90, the supreme court of New York said, "The legislature have confessedly the right of regulating the taking of fish in private rivers, and do every year pass laws for that purpose, as to rivers not navigable in any sense, and which are unquestionably private property." The state of Nebraska has a like law, and the question of its constitutionality arose in *West Point Water-Power & Land-Imp. Co. v. State,* 49 Neb. 218 (66 N. W. Rep. 6), and its validity was sustained, with a citation to the above authority and others. It should be said that the latter case, as authority, is questioned, because on rehearing the case was reversed, while on the first hearing it was affirmed. This is to be said of the case: On the hearing the case was reversed, and the law held unconstitutional, because of a noncompliance with the constitutional requirement as to what should be expressed in the title of the act, which question was not presented on the former hearing. Both opinions are published in the official report, and there is no reconsideration of the questions determined on the

first hearing. We are unwilling to believe the court would permit the case to be reported as it is, had there ever been a serious doubt of the correctness of its conclusions on the first hearing; so that, whatever may be the status of the case as to the conclusiveness of the holdings, it is evidently an expression of the judgment of the court on the questions considered. In this same connection we may further say that some of the cases we have cited—such as *Holyoke Co. v. Lyman, West Point Water-Power & Land-Imp. Co. v. State,* and others—are thought to be without force, because the dams were across navigable streams. It is true that they were; the erection of the dams being under a grant by the state, with no reservation in behalf of the public as to fishways. The law seems to be as definitely settled in favor of the public, to protect fish, and provide for their passage along the streams, in unnavigable as in navigable waters. In both instances the power to regulate is based on public interests, and it is not easy to see wherein the public may not as well assert its reserved power for such a regulation where the title has passed to the banks and bed of the stream, without express reservation, as where there is an express grant for the construction of a dam across a stream without reservation. The limitation of rights or reservation of power arises by implication of law affecting the grant in either case. But, aside from this, the courts of the country, from its very highest, have regarded these cases as so akin in principle that, almost if not entirely without exception, their conclusions have been made to rest, in cases where the dam has been constructed or maintained by grant, upon the rules applicable as well to unnavigable streams. The cases are valuable as indicating the trend of legal thought on the subject, even if not authoritative in the way of adjudications,—in which view, however, we are not disposed to concur. Were we to hold the present law unconstitutional, so as to open the way for a riparian owner whose land is on both sides of a stream, or two abutting owners, to, by a dam or other

obstruction, prevent the passage of fish up the stream, and thus deprive other riparian owners and the public of privileges as ancient as civilized history, the way would be well opened for innovations and surprises as to rights long enjoyed and of undoubted security. The streams and lakes are the natural abiding places for the fish. In them they cast their spawn and multiply their species. They constitute an important and valuable article of diet for the rich and poor, and, with the ways open that nature has provided, they are accessible to both. If the lowest riparian owner of a stream may legally block the way of their migration, the consequences to result to thousands are not readily imaginable. The law that would permit it would be the entering wedge by which the few would profit at the expense of the many. Before we sanction such a rule, its existence should clearly appear.

III. It is urged that, because of the dam being constructed thirty years before the enactment of the law, defendant has a right to maintain it by prescription. The clear weight of authority is against such a right. The cases already cited are quite decisive of this question.

The strongest case we have noticed in support of appellee's claim is *Woolever v. Stewart,* 36 Ohio St. 146. It holds to the doctrine that as between riparian owners, the maintenance of the dam for twenty-one years, under certain conditions to make the holding adverse, a prescriptive right exists, that the legislature may not disturb. The holding is made to depend clearly on a rule that there is no implied limitation upon the owner of the soil as to his right to obstruct the passage of fish along the stream, in which respect the case stands opposed to what seems to us the clear weight of authority and of reason. In Maine, the supreme court, speaking to the question, said: "No individual can prescribe against this right which is held to belong to the public." *Cottrill v. Myrick,* 12 Me. 222. In *West Point Water-Power & Land-Imp. Co. v. State, supra,* it is said

"Regarding the plaintiffs in error's reliance upon a prescription right to maintain its dam without making provision for the passage of fish, and upon the fact that the construction of the dam was authorized by the territorial legislature, it is sufficient that the reserve powers of the state, including the right to conserve and promote the public welfare at the expense of private interests, denominated the 'police power,' is inaleniable, and cannot be surrendered or bartered away by the legislature." This case involves no question of a surrender of such rights by the legislature, and we quote the language only as to its force upon such rights being lost by prescription. The authorities make the police power of the state the basis of legislative authority to prescribe the regulations as to fish and its streams; and in *Stone v. Mississippi*, 101 U. S. 814, it is said that "all agree that the legislature cannot bargain away the police power of the state." This being true, how could the legislature, beyond its power of retraction, exempt the dam owner from obligations to maintain passageways for fish, to the detriment of those conditions which it is the office of the police power of the state to conserve and protect? If this could not be, how could it be that a rule of prescription would operate to suspend such a power? It would seem that all reason, if not all authority, is against such a rule. It is thought that it is not competent for the legislature to declare the dam a nuisance, and a reason given is because it is "not a nuisance." The statement can only be of force by saying that a nuisance is legally so defined, upon other and higher authority, and that the legislature may not provide that such an obstruction against the public interests shall constitute a nuisance. Our understanding is that it is the province of the legislature to prescribe what shall constitute a nuisance, within the fundamental limitations upon its authority. One definition of a nuisance is the unlawful use of one's own property, working an injury to a right of another or of the public, and pro-

ducing such inconvenience, discomfort, or hurt that the law will presume a consequent damage. Woods Nuisance, 1; 16 Am. & Eng. Enc. Law, 923. The legislature has kept itself within the settled rule, because that the act of obstructing the passage of fish, against individual and public interests, would raise a legal presumption of damage, is too clear a proposition to be debatable. We need not consider other questions, and the judgment will stand REVERSED.