Barker, J.
The defendant is in the possession of *109 the lands on each side of a stream in the town of Allegany, in the county of Cattaraugus, called the Five Mile Run, upon which it has constructed its road-bed, and on which it now operates the same as a part of its main line, and by means of a bridge or trestle-work. It crosses the said stream ; the span of the structure is about seventy feet, is eleven feet above the water, and rests on abutments erected on each bank of the creek.
The underlying and principal question presented on this motion is, where is the title, the fee to the bed or bottom of the said stream—or where is the same vested ? The plaintiff contends that it is not in the defendant; that its right and privilege to cross the stream is in the nature of an easement ? that such is its utmost right, and a use by others of the bed of the stream, which does not disturb the defendant’s enjoyment, does not interfere with or infringe upon its right or title.
The contrary position is maintained by the defendant. It contends that the proofs show that it has secured by deed, from those who held the same, the fee to the bed or bottom of the stream, as well as to the lands on either side of the creek occupied by it, and upon which its road-bed is laid and constructed.
The determination of the controversy depends mostly, if not altogether, upon the character and capacity of the Five Mile Run, and the class of rivers or streams to which it belongs. The stream itself is about six miles in length, being rapid enough in its fall to create mill privileges at short intervals, and in fact there are four or five saw-mills located thereon, and run by the waters thereof. For a portion of the year, in season of its greatest flow, single saw-logs can be and often are floated down the same, from near its source, to supply the mills operated thereon. During some periods, those of the drier part of the year, nothing can be floated thereon, and it is nearly dry. It *110 empties into the Alleghany river, and the defendant crosses the same about one mile from its mouth. Just above the bridge is located Norton’s saw-mill. At this mill, at times, small lumber rafts are made up and run down the stream into the Alleghany river. No boat or vessel of any description ever navigated this run so far up the same as the place of crossing.
The country along the stream is settled up and improved, and from its mouth to its source the same is generally the boundary between farmers who live on the opposite banks.
When the defendant’s road was constructed, and at the time when it received its title, the lands on the east side were owned and occupied by one set of owners, those on the west by another. From each the defendant’s predecessor took a conveyance, under which it claims title. A further reference to these conveyances will be made on another proposition.
With a view of determining the question of title to the bed or bottom of rivers and streams in this State, they may be divided into classes.
First. Those where the tide flows and recurs, together with the tideless rivers of the first magnitude, such as the Niagara, St. Lawrence, Mohawk, Genesee and Alleghany.
In rivers of this' class the riparian owners have no title to the bed of the same, consequently no exclusive privileges therein; but the same remains in the State for the common use and enjoyment of all the public.
Second. Those of lesser magnitude, which are in fact navigable for portions of the year, but their capacity in that respect is not historic and traditional, and the court cannot take judicial notice of their characteristics, but must rely upon proof to ascertain the real capacity of the same and the use which may be made of them.
In this class the riparian owner takes a title in the *111 bed of the stream to the center, and the opposite owner comes np to the same line. The title is thus out of the State and in the citizen. But the public have an easement in the stream, the right to navigate the same, to use the waters in all ways in which they can be practicably utilized. And here it may be specially mentioned as bearing on the case in hand, that the capacity to float logs single or together, to run rafts, however small, gives to all the public this easement, the right to use and navigate.
Third. Those which have no navigable capacity whatever. They are wholly private.
Such a division, without more minuteness and without attempting to mention qualifications depending upon the terms of grants coming from the State, or deeds passing between individuals, will be found sufficiently accurate, in view of the facts of this case, to apply the law and to guide me in disposing of the pending motion.
The Five Mile Run does not belong to the first class; therefore the title is not in the State.
It does not belong to the third, for it has a floating capacity sufficient to carry out the lumber product of the region along its banks and about its source.
It should rightfully be placed in the second class.
Then at the time the defendant constructed its road and received its deeds from the then owners of the respective pieces of land lying on each bank of the creek, they each owned to the center line of the creek. Each of these parties did convey to the defendant’s predecessor to the center of the stream ; and it secured the same title to the bed of the stream, subject to the easement, which it received to the land on the banks.
In support of the foregoing propositions and conclusions, I shall not cite more than Morgan v. King, 85 N. Y. 454; People ex rel. Loomis v. Canal Appraisers, 33 Id. 461.
*112 The plaintiff further contends, that if it is held that the riparian owners own the fee to the bed of the stream, then by the deed from Gfeorge C. Sheldon and Olcott P. Boardman, who deeded to the defendant on the west bank of the creek, it only secured the right to lay its track and operate its road, a mere easement, and that the fee remained in the grantors, who could use the land for all purposes not inconsistent with such enjoyment, and the plaintiff’s use is no interference with the defendant’s use and privilege.
In considering this point, I shall hold as a fact that the place in the bed of the stream where the plaintiff’s pipe is laid is on the piece of land embraced in Sheldon’s deed, and is not on any part of the land embraced in Le Roy’s conveyance.
The deed given by Sheldon and Boardman was to the New .York & Erie Railroad, its “ successors and assigns.” The same was upon a consideration of $600,. and contained covenants of warranty.
The words and clauses used were sufficient, and such as are customarily used to convey the fee in land. Tt is a deed in perpetuity, notwithstanding the condition inserted in the deed “the above described premises being hereby conveyed for the uses and purposes of a railroad and for.no other purposes.” This constitutes a condition subsequent in the law. It does not prevent the fee vesting in the grantee, nor does it restrain the grantee from alienating the same. So long as the condition is fully observed the fee is out of the grantor who imposed the condition; on its violation, then the title reverts to the grantor. The event may never happen which determines the purchaser’s estate.' There is only a possibility'of a reverter. No estate is left in the grantor. Such are the authorities. None can be cited to the contrary (4 Kent Comm. 370, and notes; Nicoll v. N. Y. & Erie R. R. Co., 12 N. Y. 121; Underhill v. Saratoga & W. R. R., 20 Barb. 455).
*113 The argument that the N. Y. & Erie R. R. Co. could not take an estate in tee in lands, I regard as utterly fallacious, and needing but little consideration.
At the time of the delivery of Sheldon’s deed, October 5,1850, the general railroad law, enacted that year, was in full force and effect. In section 49 it is provided that all existing railroad corporations, within the State, “ shall respectively have and possess all the powers and privileges contained in this act.” Under the law as it then stood, the corporation could take the fee to lands necessary for its use. In section 28, subd. 3, the language is, “ To purchase, hold and use all such real estate and other property as may be necessary for the construction and maintenance of its railroad.” At common law, unless limited by enactment, corporations had the power to purchase land and convey such real estate as the purposes of its organization might require (2 Kent Comm,. 281; Nicoll v. N. Y. & Erie R. R. Co., 12 N. Y. 121, 127).
In this State there is no disabling act preventing a railroad corporation from taking by purchase the fee simple in such land as is necessary for its purposes. “ Corporations have a fee simple for the purpose of alienation, but they have only a determinable fee for the purpose of enjoyment. On the dissolution of the corporation the reversion is to the original grantor or his heirs; but the grantor will be excluded by the alienation in fee, and in that way the corporation may defeat the possibility of a reversion ” (2 Kent Comm. 282; 12 N. Y. 130).
Thus, by this deed from Sheldon and Boardman, conveying the land on which the pipe is laid, they parted with all right to enter on such land for any private purpose, and the same became vested in their grantee, its successors or assigns.
The purchaser, the railroad company, took the title, subject to the public easement, which is the right to *114 navigate the stream to the extent and in the manner its natural capacity will admit.
The inquiry is now to be made, whether the use sought to be made of the bed of the' stream is of the nature and kind which the public have ; or whether it is so different that it must be held an attempt to subject the fee to a further and an additional burden. I am of the opinion that the use sought to be made of the bottom of the stream by the plaintiff is new in character, private in its nature, and is an invasion of the defendant’s property rights, and that the plaintiff is guilty of a technical trespass. • The easement reserved to the public is to navigate the stream, to use the waters naturally running in the creek to move vessels, boats or any craft, logs and rafts which will float on these waters by wind or current. To sanction the privilege .claimed by the plaintiff would necessarily affirm a right in individual's and corporations to devote the bed of the stream to purposes which would be manifestly inconsistent with the ownership in fee which the defendant has. It would be to allow the public to use it as a road-bed for all kinds of travel and traffic, when the stage of water would allow of it. The railroad company could with like right lay down timbers and construct and use a railroad ; telegraph companies erect poles and carry wires under the bridge or lay encased wires under the water. There are innumerable uses to which it might be devoted, similar in character, and the water naturally running in the stream would be no impediment whatever, and at the same time such uses would not be the least disturbance or interruption to the navigation that can be carried on in the stream. To illustrate the fallacy,of the plaintiff’s position, and to show that it is not acting within its rights as one of the public, suppose the plaintiff should seek, against the consent of the owner, to run its pipes up the whole length of this stream, *115 and to lay the same on or under the several mill dams thrown across the stream. Can it be said such an act would not be a trespass ? In streams like this the riparian owners have the right to build dams with a view to running mills and factories, if the navigation of the stream is not interfered with. All persons are trespassers who in any manner obstruct them. This right of the riparian owner is protected because he owns the fee in the bed of the stream—the protection he enjoys illustrates that the plaintiff has not the privilege which it claims. The law cannot protect both claims. In streams of this class the rights of the public under the easement are limited to a particular use, as they are in a public highway. Where the fee is in the adjacent land-owner, and where any one of the public seek to. impose an additional burden, to make a new use not reserved to the public, he is guilty of a trespass (Craig v. Rochester City & Brighton R. R. Co., 39 N. Y. 404; Bloomfield Gaslight Co. v. Calkins, 62 Id. 388; Williams v. N. Y. Central &c. R. R. Co., 16 Id. 97; Estry v. Baker, 48 Maine, 495).
The cases decided in the Pennsylvania courts and referred to by the plaintiff’s counsel have been fully examined and considered, but they are found not to be at all applicable to similar cases arising in this State. Under the laws of that commonwealth railroad companies do not take the title to the lands on which they build and construct tracks ; they have and enjoy an easement merely, a simple right of way. The proprietor of the land retains the fee simple in the land and the right to every use and enjoyment in the same, not inconsistent with the enjoyment of the easement. In conformity with these propositions the case of Graft v. Oil Creek & Alleghany River Railway Co. was decided, opinion by Tounsley, J. Graft, the owner of lands, conveyed to the railroad company a right of way over his lands; the company constructed its road *116 bed and laid down rails and put the road into operation. Graft then, against the company’s objection, forced a pipe line in which to convey oil under the road-bed and put it into use, nowise interfering with the use and operation of the road. It was held to be no interference with the company’s easement, and a right which the proprietor of the land had, who continued to own the fee in the lands. The judge placed his decision on the authority of the Western Pennsylvania Co. v. Johnson (9 P. F. Smith, 290); Lyon v. Gromley (3 P. F. Smith; 9 Casey, 57). In all the cases the acts complained of were held not to interfere with the easement nor to endanger travel or impede traffic on the road.
These considerations lead me to the conclusion that the injunction was improperly granted, in view of all the facts disclosed on the hearing. The controversy between these corporations is brought on by the recent acts of the plaintiff—really they are cotemporaneous with the filing of this bill. These acts are held to be trespasses on the defendant’s lands. The defendant was the party in possession when the controversy arose ; for this reason the restraint must be removed. It does not lie in the discretion of the court, under the circumstances, to continue the same during the litigation. I have searched in vain for a reliable precedent, or a rule of practice, to justify the continuance. The act of the plaintiff is a mere trespass, for the present doing no permanent injury, nor interfering with the defendant’s traffic nor endangering the same. Both parties wished the court to make a full and careful investigation of their respective rights on the proofs presented, and each must abide by the conclusions reached in this proceeding.
Note on Judicial Notice op Geographical and Similar Facts.
The extent to which the courts will notice geographical facts, has been matter of much diversity of decision, partly, of course for reasons explained in note in Abb. N. C.
*117 The principal cases are as follows :
Transactions and objects which necessarily connect themselves with, and form a part of, the history or geography of the country, will be judicially noticed without particular evidence to prove their notoriety. Thus, the court will notice the notoriety of a place used in describing a tract of land, at time of such description; a battle connected with the history of the settlement of the State having taken place there, one year before the description was made. Hart v. Bodley, Hard. (Ky.) 98.
The supreme court of Missouri will take judicial notice of the fact that the State of Missouri is east of the Rocky Mountains, -where a California statute, which is properly pleaded and proved, provides that a certain rate of damages shall be paid on bills drawn within that State, on persons residing in States east of the Rocky Mountains. Price v. Page, 24 Mo. 65.
An appellate court will judicially notice the geographical relation of the place of a contract to other places, shown to have been within the Confederate lines at a certain time, for the purpose of determining that a jury were justified in inferring that the place of contract was also within the Confederate lines at that time. 1871, Bond v. Perkins, 4 Heisk. (Term.) 364.
Courts will take judicial notice of the course of the seasons and of husbandry, and that the use of a farm for six months during the cropping season is worth much more per acre than during six months including winter. Ross v. Boswell, 60 Ind. 235, 340.
[In the foregoing cases, the appellate court exercising the power of taking such notice, affirmed the judgment appealed from.]
The court, taking judicial notice of the seasons, and of the general course of agriculture, may know that a crop of the country would not, at a certain date, have matured so as to be severed. Floyd v. Ricks, 14 Ark. 386, 292.
[In the last case, the appellate court took notice for the purpose of reversing the judgment.]
Under the rule that they will notice whatever ought to be generally known, the court will not take judicial notice of the times when crops mature in another county, for the time varies greatly in different counties. They will take judicial notice of facts of unvarying occurrence, but not of the vicissitudes of climate or the seasons. Dixon v. Niccolls, 39 Ill. 372.
Although the law notices the regular course of nature, as well in regard to the revolution of the seasons, as in relation to vegetables and animals, yet the truth of an alleged uniform and regular course of nature must be established; and the court will not judicially say that *118 the concentric layers in the trunk of a tree mark each a year’s growth of the tree, and thus indicate its age by the number of concentric layers; though, if the fact were proved that the number of layers in a tree marks the number of years of the age of the tree, and that trees increase by the annual accession of one such layer, then the age of other trees similarly situated might be proved in the same way. Patterson v. McCausland, 3 Bland (Md.) 69.
The courts, it seems, will take judicial notice of large navigable rivers, such as the Mississippi, Ohio and Wabash rivers, as a part of the geography of the country, and of their navigability as a matter of public history, and of the non-navigability of a river (such as the Wabash) above a point where its historic character ceases, that is, where it ceases to be a highway for commerce between States. Neaderhouser v. State, 28 Ind. 257, 267.
The courts of Wisconsin take notice that the capacity of many small navigable streams in the State, to float logs and lumber to market, has been greatly increased by the erection of dams across them (pursuant to legislative authority), to hold or discharge their waters, as circumstances may require. 1877, Tewksbury v. Schulenberg, 41 Wis. 584, 593.
It was said in the dissenting opinion in Whitney v. Gauche, 11 La. Ann. 433, that the courts will take judicial notice that the river Mersey, in England, is filled with salt water, the tide ebbing and flowing therein to a great height.
The supreme court of Indiana will take notice of the geographical position of the falls of the Ohio river, that they are local, aud in Clark county, and there are no pilots appointed for other falls in the State. The subject matter of a law being local, a local law applicable to it does not infringe the constitution. Cash v. Auditor of Clark Co., 7 Ind. 227.
The courts will take judicial notice of the situation of a town in a foreign country, and that a bar exists at the mouth of the river upon which such town lies, which vessels of the draft of the vessels in suit cannot cross, that the river is narrow opposite the town, and that the river is the boundary line between a foreign country and the state at war. The Peterhoff, Blatchf. Prize Cas. 463, 521.
A prize court will take notice of a well known and obvious system of conducting trade with the enemy, in articles contraband of war, as where neutral vessels cleared from London with papers for a nominal destination in neutral waters, which destination was only a port of transshipment or a point of departure for a port of the enemy. Ib. 609.
In adjusting the rights of parties, courts will take notice of *119 changes in the course of business in the country, and of new processes of practical utility in facilitating trade,—e. g., the process by which loaded cars are transferred from the track of a railway upon one side of a river, to those of a railway upon the other side without breakingbullc. Wiggins Ferry Co. v. Chicago & Alton R. R. Co., 5 Mo. App. 347, 375.
The law fully recognizes the necessity of competition, and here again not only takes notice of, but enforces, a rule of trade. Ib.
The court will take judicial notice of the boundaries of the State, and the extent of its territorial jurisdiction. Gilbert v. Molnie, 19 Iowa, 319.
The United States district courts will take judicial notice that the representative district and the judicial district of the State of Oregon are identical in area with the State. Semble, that the courts should take notice of the fact that the executive of the State did call a special election for representative in Congress from a certain district on a specified day. lb.; 1873, United States v. Johnson, 2 Sawyer, 482.
Courts take judicial notice of geographical division of the State, when necessary to determine whether the residence of a witness, as stated in his deposition, is more than thirty miles from the place of trial. 1868, Hinckley v. Beckwith, 23 Wis. 328.
The courts will take judicial notice of a town created by law, and of the county in which it is situated. Martin v. Martin, 51 Me. 366; Vanderwerker v. People, 5 Wend. (N. Y.) 530; State v. Powers, 25 Conn. 48; State v. Tootle, 2 Harr. [Del.) 541.
The courts will take judicial notice from the records of the chancery court that there never was, legally and constitutionally, a county of a certain name. Brown v. Elmo, 10 Humph. (Tenn.) 135.
It seems, that the courts will not take judicial notice whether or not a particular tract or grant of land lies within the twenty border-leagues, the boundary line of the leagues not having been surveyed or designated. Edwards v. Davis, 3 Tex. 821, 325.
Courts must judicially notice that there is a city of a specified name in the State, but cannot know that there is another city of the same name in another State; and will presume that the city referred to in a pleading is the one within the State. Woodsworth v. Chicago, &c. R. R. Co., 21 Wis. 309.
The courts will take judicial notice that the town of Milwaukee once existed as a corporation, though unable to find the act of the-legislature incorporating it, there being acts of the territorial legislature, and decision of the supreme court of the territory, recognizing such town. Swain v. Comstock, 18 Wis. 463, 468.
The courts cannot take judicial notice that a city or town of a *120 specified name, such as New Orleans or New York, is in another State. Whitlock v. Castro, 23 Tex. 108.
It is error for the courts to take judicial notice that a city, such as New Orleans, New York, Janesville, is in another State. Riggin v. Collier, 6 Mo. 568, 573.
It seems, if there were an averment to that effect in the declaration, but slight evidence would be necessary to prove it. lit.
[The last two are extreme cases, in which the appellate court reversed the judgment below, on the ground that the court erred, not in its knowledge of geography, but in not pretending to be ignorant. ]
The court will take notice of the fact that a city named is within the State; and when in ejectment a deed is offered in evidence describing the premises as “ lot five in block one, in Haley’s addition to ” such city, the court will presume the lot to be in the city and State. Harding v. Strong, 42 Ill. 148.
The supreme'court of Indiana will not judicially know the names of towns or cities which adopted the act of 1852 concerning incorporation, &c., as their charter. It will, it seems, be presumed that such towns, in adopting the act as a charter, retained former names. Johnson v. Common Council of the City of Indianapolis, 16 Ind. 227.
That a certain township is in a certain county, and within the jurisdiction of a justice of the peace trying the case, may be determined by him ex officio. On appeal, for purpose of sustaining his judgment, it is presumed that he knows the extent of his own jurisdiction- and the lands therein, as designated by the public surveys. Tinder rule that pleadings before inferior tribunals must show jurisdiction, a complaint brought before justice of the peace of J township, L county, Iowa,” where the land is described in complaint by government surveys, will be assumed to be sufficient. The courts may take judicial notice of United States government surveys. Wright v. Phillips, 2 Greene (Iowa), 191.
The courts will take judicial notice of the relative situation of the sections and quarter sections of land, according to government surveys. Priege v. Exchange, &c. Ins. Co., 6 Wis. 89, 103.
The courts will take judicial notice that a quarter section of land is made up of four forties with well defined bounds. It is error not to do so, and to rule out evidence which is material when such notice is taken. Hill v. Bacon, 43 Ill. 477.
The supreme court of Indiana will take judicial notice that the lands in Bipley county were surveyed and laid out by act of Congress. And that their sides are east, west, north and south, and that there can be no such description of, or in relation to a congressional *121 survey of them as the south-east side of a quarter section. 1871, Buchanan v. Whitman, 36 Ind. 257.
The courts will take judicial notice of the government surveys and the legal subdivisions of the public lands, and, where all the parties live in the State, and the land is referred to by such divisions without mention of the State in which it lies, will presume the land is within the State. Atwater v. Schenck, 9 Wis. 160.
The court, in adjudicating upon surveys, are bound to notice judicially the magnetic variation from the true meridian, and its progress from the time of an original survey down to the making of one complained of. Such “variation is one of those principles which this court are bound to notice, as relative to surveys, as much as they would be bound to notice the laws of gravitation, the descent of the waters, the diurnal revolution of the earth, or the change of the seasons in cases where they would apply.” Bryan v. Beckley, 6 Litt., (Ky.) 91.
Though courts take judicial notice of local divisions of the State into counties, cities and towns, they are not bound to notice the distances of different places in counties from each other. Goodwin v. Appleton, 22 Me. 453.
The courts will not take judicial notice of the local situation and distances of places within a county, from each other. Goodwin v. Appleton, 23 Me. 453.
Although the United States circuit courts should take judicial notice of the distances between well-known geographical points in the United States, they will not officially take notice how long it might take an express company to carry a sum of money from one designated city to another—from Chicago to Muncie, Ind. What is a reasonable time for this is a question of fact. 1866, Rice v. Montgomery, 4 Bliss, 75.