2. EXECUTORS AND ADMINISTRATORS (§ 511*)—ACCOUNTING—APPEAL—COSTS—
PAYMENT OUT OF ESTATE.

A decree modifying a decree of the Surrogate's Court settling the ac-
count of an executrix, with costs to the appellant, did not contemplate
payment of the costs out of the estate, not having expressly so provided.

[Ed. Note.—For other cases, see Executors and Administrators, Cent.
Dig. § 2257; Dec. Dig. § 511.*]

In the matter of judicial settlement of the account of Arline A.
Perry, as executrix of Anne Marchant Stacy, deceased. On motion
to amend the judgment of the Appellate Division modifying a decree
of the Surrogate's Court settling the account of the executrix. Motion
denied.

See, also, 114 N. Y. Supp. 246.

Argued before WOODWARD, JENKS, GAYNOR, BURR, and
RICH, JJ.

Arnold Davidson, for the motion.

Charles W. Church, Jr., opposed.

GAYNOR, J. It is not necessary to amend our judgment of modifi-
cation of the decree of the surrogate by adding the words "and dis-
bursements" to the words "with costs." The latter phrase includes
disbursements except in appeals from orders; following by analogy
in the case of surrogates' decrees or judgments the express provision
of section 3256 of the Code of Civil Procedure in respect of other
courts, viz., that "a party to whom costs are awarded in an action is
entitled to include in his bill of costs his necessary disbursements."
There is no foundation for the suggestion that under our order the
costs are to be paid out of the estate. If we meant that we would have
said it. To grant this motion would be to introduce a bad precedent.

The motion is denied without costs. All concur.

---

## In re DELAWARE RIVER AT STILESVILLE.

(Supreme Court, Appellate Division, Third Department. March 10, 1909.)

1. FISH (§ 1*)—PUBLIC PROPERTY—NATURE OF RIGHT.

Fish running in a river are feræ naturæ, and while in their natural
element, unconfined, are the common property of the people of the state,
in which no person can acquire private rights without reducing them to
actual possession.

[Ed. Note.—For other cases, see Fish, Cent. Dig. § 1; Dec. Dig. § 1.*]

2. WATERS AND WATER COURSES (§ 40*)—RIGHTS OF LANDOWNER.

The water that flows over the land of a person is not his property, he
at most having only a usufructuary right therein, and must so use it as
not to unnecessarily and unreasonably impair its usefulness by other
riparian proprietors.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig.
§ 32; Dec. Dig. § 40.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. WATERS AND WATER COURSES (§ 53*)—DAM—RIGHT TO MAINTAIN.
    The right of riparian owners to maintain a dam in a stream is subject
    to the rights of the public to use the waters in any way they may be
    practically utilized.
    [Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig.
    § 53.*]

4. FISH (§ 8*)—PROPAGATION—OBSTRUCTION BY DAMS—REGULATION.
    A riparian owner's right to maintain a dam in a river was subject to
    the right of the Legislature to require the construction and maintenance
    of fishways therein so as to prevent the obstruction of the free passage of
    fish up the stream to the detriment of other riparian proprietors or the
    public within the state's right to regulate fisheries.
    [Ed. Note.—For other cases, see Fish, Cent. Dig. § 16; Dec. Dig. § 8.*]

5. FISH (§ 8*)—REGULATION.
    The Legislature may regulate the taking of fish from the streams of
    the state, whether from public or private waters.
    [Ed. Note.—For other cases, see Fish, Cent. Dig. § 16; Dec. Dig. § 8.*]

6. NAVIGABLE WATERS (§ 1*)—"NAVIGABLE RIVER."
    A river is navigable if the tide ebbs and flows therein, or if it is in
    fact navigable during some season of the year for the floatage of boats,
    lighters, rafts, logs, etc.
    [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 5–9;
    Dec. Dig. § 1.*
    For other definitions, see Words and Phrases, vol. 5, pp. 4675–4684;
    vol. 8, p. 7728.]

7. CONSTITUTIONAL LAW (§ 93*)—FISH—FISHWAYS—STATUTES—VESTED RIGHTS
    —VALIDITY.
    Laws 1828, p. 155, c. 142, authorized the construction of a dam in the
    West branch of the Delaware river which had been previously declared
    to be a public highway, limiting the height of the dam to 24 inches above
    the water level, and providing for a sluiceway which afforded a sufficient
    fishway. The dam was destroyed, reconstructed, and raised until it
    was more than twice the height of the original dam, whereupon the
    Forest, Fish and Game Commissioner required the owner to construct a
    fishway therein as authorized by Forest, Fish and Game Law (Laws 1900,
    p. 60, c. 20) §§ 208, 209. Held, that the owner of the dam had no vested
    right to maintain the same without providing an efficient fishway, and
    that the statute, in so far as it applied to such owner, was not therefore
    unconstitutional.
    [Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 93.*]

8. FISH (§ 8*)—REGULATION—FISHWAYS.
    Where petitioner under legislative authority constructed a dam in the
    West branch of the Delaware river, which operated to prevent fish from
    ascending, but it appeared that the spawning during which the fish usual-
    ly ascended the river only took place between March 1st and June 16th
    of each year, an order requiring petitioner to maintain a proper fishway
    through the dam should be modified so as only to require that the way be
    kept open for such period.
    [Ed. Note.—For other cases, see Fish, Dec. Dig. § 8.*]

Appeal from Special Term, Delaware County.

Application by the Deposit Electric Company for an order vacating
an order of James S. Whipple, Forest, Fish, and Game Commission-
er, requiring erecting of an efficient fishway in petitioner's dam in the
West branch of the Delaware river at Stilesville, N. Y. Application
denied, and petitioner appeals. Order modified.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The following is the opinion of Lyon, J., at Special Term:

This is an application by the Deposit Electric Company for an order of the court vacating the order of Hon. James S. Whipple, Forest, Fish, and Game Commissioner of the state of New York, served upon said electric company, requiring it to erect an efficient fishway in its said dam by constructing a chute 5 feet wide, 1 foot high on the inside, and 40 feet long, which shall at all times remain tight, unobstructed, and uncovered, the bottom of the upper end of which shall be at the 4-foot level of such dam, and the lower end of which shall extend under the water below the dam, and a portion of the inner part of which chute shall be fitted with crosspieces to break the force of the current of water passing through the chute, and thus allow the ready ascent of fish from the water below to the water above the dam.

The facts as established by the affidavits submitted upon this application are that the Deposit Electric Company's said dam is situated upon the West branch of the Delaware river, which branch is a fresh-water stream about 75 miles in length, having its origin at Stamford, N. Y., and joining the East branch of the river at Hancock, N. Y., and it may be inferred from the affidavits that the Delaware river meets tide water at Philadelphia, some 40 miles from its termination in Delaware Bay, although doubtless, as a fact perhaps immaterial here, somewhat further upstream; that in the year 1822 the Legislature of the state of New York (page 195, c. 195) declared the West branch of the Delaware river to be a public highway, the act providing, however, "that nothing herein contained shall be construed to prevent any person or persons from erecting, keeping and maintaining over, on or across the said West and East branches of said river * * * any bridges, mill dams, water fences or eel wires, to be erected or constructed in such manner as in no wise to interrupt or materially injure the free navigation of the waters of the said streams with rafts or lumber in time of an ordinary freshet for running lumber." That in the year 1828 (page 155, c. 142) the Legislature provided that it should be lawful for the three persons therein named, their associates and assigns, to erect and maintain a dam across the West branch of the Delaware river at the location of the said Stilesville dam, not exceeding 24 inches above low-water level, "but there shall be constructed and maintained in said dam a sluiceway of such dimensions and construction as to render the passage safe and easy for boats, arks and rafts at all times during the continuance of said dam," and that the dam should be constructed in three years, and should not affect or injure the rights or properties of any person unless with consent first obtained, and that "this act and everything therein contained shall be deemed to be taken subject to the right of the Legislature at any time hereafter, to alter, modify or repeal at pleasure."

That about the year 1830 a brush and stone dam, surmounted by hardwood plank, making the dam in all two or three feet in height, was constructed upon the site of the present Stilesville dam, and that it furnished the power which operated a sawmill, carding mill, ax factory, and excelsior factory successively, portions of the dam at times being washed out, but being restored and probably raised one foot when owned by Collett, until about the year 1895, when a large portion of the dam went out and was not rebuilt, and the business at the dam was abandoned; that in or about the year 1901 the Deposit Electric Company purchased the property and built a dam, which is the upper portion of the present dam, which was constructed by bedding five lines of timbers, each about 1 foot square, constituting a substructure of stringers or mud sills, 24 feet in width, covering a space across the river, held in place by long iron rods driven through the timbers and into the ground. Upon the foundation afforded by these stringers the present dam of masonry, timbers, and planking was constructed. The present dam is 2 or 3 feet higher than the old brush dam originally constructed, is about 350 feet in length, and since the construction in the summer and fall of 1902 of the crib apron work, as hereinafter stated, is about 24 feet in width, with a spillway 100 feet long, the crest of which is 1 foot lower than the crest of the remaining 250 feet of the dam.

There was a spillway and apron in the brush dam as originally constructed, and fish could pass up over the dam at all times of the year excepting in times

of low water; and, before the construction of the dam by the Deposit Electric Company, shad were at times caught several miles above the dam, and other fish were more numerous above the dam than since the construction of the present dam. It was not possible for shad or other fish to pass up over the dam constructed by the Deposit Electric Company in 1091, nor is it possible for any fish to pass up over the present dam since the spillway and alleged fishway were constructed in 1902, unless during the periods of extraordinary freshets, if, indeed, fish run at such times. In periods of ordinary water the lower end of the spillway is out of the water, and during the greater portion of the year, while the slash boards are on, there is very little water in the river below the dam, between the dam and the point in the river where the water from the flume re-enters the river some 70 to 80 rods below the dam. During the earlier years many rafts of logs ánd lumber were annually run down the Delaware river, but during the later years the running of rafts has been infrequent.

During a considerable portion of the year slash boards are maintained by the electric company upon the spillway, raising it to the height of the remainder of the dam, and at times slash boards have been placed by the company upon the remaining 250 feet of the dam, and also sufficiently high upon the spillway to raise it to a corresponding height.

The fish which inhabit the West branch of the Delaware river are the ordinary fresh-water fish, mostly bass, chub, trout, pickerel, suckers, and bullheads, and usually in the spring of the year shad pass up the river from the ocean. The land on each side of the river at the ends of the dam, and above for a distance, is owned by the Deposit Electric Company, which has, also acquired the rights of flowage of the lands covered by the present pond, which extends nearly, if not quite, twice as far up the river as the pond of the original brush dam.

In the winter and spring of 1901 and 1902 the gravel below the dam for practically the whole length of the dam was washed out, creating a deep hole nearly or quite across the river, and threatening the undermining and destruction of the dam.

By chapter 594, p. 1736, of the Laws of 1902, the Legislature appropriated "for a fishway in the Delaware river over the Deposit Electric Company's dam, $1,500, or so much thereof as may be necessary."

Pursuant to such appropriation, in the month of July, 1902, "plans and details of fishway proposed for the Deposit Electric Company's dam, Delaware river, Delaware county, N. Y.," were prepared by the Engineer's Department of the state of New York, which plans were approved at a meeting of the Forest, Fish and Game Commission held August 12, 1902, and during the summer and fall of 1902 such hole below the dam, extending practically the whole length of the dam, as above stated, was filled by placing cribwork therein, and filling the cribwork to the top with stones, and capping the same with small timbers, thereby widening the dam the whole length thereof, about 10 feet; and also a spillway 100 feet wide, the crest of which was 1 foot below the top of the dam, was constructed; and in the month of October, 1902, there was paid to R. H. Palmer, who was a stockholder, and, as respondent claims, an officer also, of the said electric company, by the state of New York, pursuant to said appropriation, the sum of $985.05 "for material and labor in building fishway in dam located at Deposit, N. Y., in the Delaware river." Whether any part of the moneys so paid by the state was for labor and material in constructing any portion of the dam or cribbing other than that constituting the spillway is not stated, excepting under an indefinite allegation upon information and belief.

Since the construction of said spillway in 1902, said dam has not interrupted or materially injured the free navigation of the waters of the stream with rafts or lumber in times of ordinary freshets for running lumber.

A fishway was not built in the manner specified by the said plans of the State Engineer's office, but cleats about eight feet long were spiked upon the spillway at the outer edges, and these cleats were soon thereafter destroyed or removed. Such alleged fishway seems to have been temporarily replaced during a portion of each subsequent year with a covered chute which has been taken out by the ice.

In the year 1906, complaints having been made to the Forest, Fish, and Game Commissioner that the dam obstructed the passage of fish up the river, the deputy commissioner went to the dam and investigated the conditions there, the attorneys and certain of the officers of the electric company being present, but deposing that they understood that the purpose of the visit of the deputy commissioner related to certain indictments then pending against the directors of the electric company by reason of the construction and maintenance of the same as a public nuisance. Soon thereafter, and on August 6, 1906, the Forest, Fish, and Game Commissioner made the order complained of, and for the vacating of which this application is made.

The Deposit Electric Company, which is a domestic corporation, has expended the sum of about $75,000 in constructing an electric power plant just below said dam, and in building said dam and appurtenances, and in purchasing and leasing lands and water rights in connection with its power station. Complying with the said order of the commissioner would prevent the electric company maintaining slash boards upon the dam, and thereby much lessen the power which has heretofore been obtained by the electric company by such means, and materially increase the cost to the electric company of supplying, under contract, lights to the villages of Deposit and Hancock, and of furnishing lights and power to other customers. The electric company, objecting to complying with the order, thereupon made this motion at a Special Term of this court, asking that such order of the commissioner be set aside, and that the Deposit Electric Company be relieved from all the requirements and provisions thereof. Negotiations with the view of coming to an agreement mutually satisfactory having been unavailing, the matter now comes up for determination.

The Forest, Fish, and Game Law (chapter 488, p. 983, Laws 1892, as re-enacted with amendments by Laws 1900, p. 22, c. 20, being chapter 31 of the General Laws) provides, so far as applicable here (sections 55 and 61), that no person shall by means of any rack, screen, weir, or other obstruction in any creek, stream, or river, prevent the passage of fish protected by law. In 1875 (chapter 602, p. 733) the sum of $15,000 was appropriated for the purpose of removing obstructions from the Delaware river and its branches above the point where the New Jersey state line crosses the river. What action, if any, was taken under this act is not shown. The forest, fish, and game law also provides (section 208) that before the construction of a dam is commenced on any stream more than six miles long inhabited by fish protected by the act, included in which are the fish inhabiting the West branch of the Delaware river, the plans thereof and a statement of the same, length and location of the stream, shall be given by the commission by the person, or, if by public authority, by the official, directing or permitting the work. No such notice was given of the proposed construction by the Deposit Electric Company of this dam in 1901. Section 209 provides: "Fishways ordered. The commission may by an order entered in their minutes and served by copy on any person or official direct the construction of fishways in proper form in any dam, or if there be fishways, such changes therein as will make them efficient. Any person or official receiving such an order may on notice to the commission, apply to be relieved therefrom to the Supreme Court, which shall have power to affirm, reverse or modify the same as justice requires." Section 211 provides the penalty for the failure, refusal, or neglect of any person owning or maintaining a dam to comply with the order of the commission to build, repair, or change any fishway, or, if reviewed by the court, the official order relating thereto. By chapter 94, p. 230, of the Laws of 1901, it was provided, so far as is relevant to this application, that the Forest, Fish, and Game Commissioner shall consist of a single commissioner, who shall have all the powers and duties now possessed by such commission.

The important questions here involved are whether the Forest, Fish, and Game Commissioner has the power to order the placing of a fishway by the Deposit Electric Company in its dam across the West branch of the Delaware river at Stilesville, N. Y., and, if so, whether the order which has been made by the commissioner is a reasonable exercise of such power.

Fish running at large in the West branch of the Delaware river are feræ naturæ, and while in their natural element, unconfined, are the public prop-

erty of all the people of the state in common, and no person can acquire property therein, divested of the rights of others, excepting by taking and reducing them to actual possession; and while an individual may thus acquire a qualified property therein, yet if the fish escape and return to the river and are again at large, they become public property, and subject to appropriation by the first person who takes them. People v. Doxtater, 75 Hun, 472, 27 N. Y. Supp. 481, affirmed 147 N. Y. 723, 42 N. E. 724.

The water which flows over the lands of a person is not his property, and at most he has a mere usufructuary right therein, and must so use it as to not unnecessarily and unreasonably impair its usefulness by other riparian owners. While the Deposit Electric Company may own the land on which the dam is built, and also a large portion of the lands covered by the pond, yet as was said in Sweet v. Syracuse, 129 N. Y. 335, 27 N. E. 1081, 29 N. E. 289: "It is a principle recognized in the jurisprudence of every civilized people from the earliest times that no absolute property can be acquired in flowing water. Like light, air, or heat of the sun, it has none of the attributes commonly ascribed to property, and is not the subject of exclusive dominion and control. * * * While the right to use it as it flows along in a body may become a property right, yet the water itself, the corpus of the stream, never becomes, or in the nature of things can become, the subject of fixed appropriation or exclusive dominion, in the sense that property in the water itself can be acquired, or become the subject of transmission from one to another. Neither sovereign nor subject can acquire anything more than a mere usufructuary right therein. * * * These propositions have been often stated by jurists and in judicial decisions in different forms, but it is believed that they all concur in the same general result" (citing a large number of authorities). The right of the Deposit Electric Company to maintain its dam has at all times been subject to the rights of the public.

The people of the state have certain easements, one of which is the right to transport thereon the product of the forest and soil along its banks (Slater v. Fox, 5 Hun, 544), and use the waters in any way in which they can be practically utilized (Buffalo Pipe Line Co. v. N. Y., etc., R. R., 10 Abb. N. C. 107). The people of the state have also as an easement in this stream the right to have fish inhabit its waters and freely pass to their spawning beds and multiply, and the right to take and use such fish for food, subject to such regulations as the Legislature may prescribe; and no riparian proprietor upon the stream has the right to obstruct the free passage of fish up the stream to the detriment of other riparian proprietors or of the public. As is said in Gould on Waters, § 206: "Riparian owners upon navigable waters cannot lawfully use the water so as to impair the public rights of navigation and fishery; and by the common law the right to have fish pass up private rivers from the sea is a common right in all the proprietors upon the stream." The right of the Legislature to regulate the taking of fish from the streams of the state, and even from private waters, has long been established. Hooker v. Cummings, 20 Johns. 91, 11 Am. Dec. 249; People v. Doxtater, 75 Hun, 472, 27 N. Y. Supp. 481, affirmed 147 N. Y. 723, 42 N. E. 724, commenting upon People v. Platt, 17 Johns. 195, 8 Am. Dec. 382.

By the common law of England, rivers were navigable where the tide did not ebb and flow. Hooker v. Cummings, supra. A river is in fact navigable on which boats, lighters, or rafts may be floated to market. Norgan v. King, 35 N. Y. 453, 91 Am. Dec. 58; Buffalo Pipe Line Co. v. N. Y., etc., R. R. Co., supra; Browne v. Scofield, 8 Barb. 239. If a stream is of sufficient capacity for the floating of rafts and logs in the condition in which it generally appears by nature, it will be regarded as public, notwithstanding there may be times when it becomes too dry and shallow for the purpose. Cooley's Constitutional Limitations, p. 861. The West branch of the Delaware river was declared to be a public highway by chapter 195, p. 195, Laws 1822, as hereinbefore stated.

The courts of other states and of the United States have uniformly held that a riparian owner has not the right to maintain a dam or other obstruction which prevents the passage of fish up the streams, and that the Legislature may establish regulations to prevent obstructions to the passage of fish.

In People v. Truckee Lumber Co., 116 Cal. 399, 48 Pac. 374, 39 L. R. A. 581,

58 Am. St. Rep. 183, it was said: "The fish within our waters constitute the most important constituent of that species of property commonly designated as wild game, the general right and ownership of which is in the people of the state (Ex parte Maier, 103 Cal. 476, 483, 37 Pac. 402, 42 Am. St. Rep. 129), as in England it was in the King; and the right and power to protect and preserve such property for the common use and benefit is one of the recognized prerogatives of the sovereign coming to us from the common law, and preserved and expressly provided for by the statutes of this and every other state of the Union. * * * The dominion of the state for the purposes of protecting its sovereign rights in the fish within its waters, and their preservation for the common enjoyment of its citizens, is not confined within the narrow limits suggested by defendant's argument. It is not restricted to their protection only when found within what may in strictness be held to be navigable or otherwise public waters. It extends to all waters within the state, public or private, wherein these animals are habited or accustomed to resort for spawning or other purposes, and through which they have freedom of passage to and from the public fishing grounds of the state. To the extent that waters are the common passageway of fish, although flowing over lands entirely subject to private ownership, they are deemed for such purposes public waters, and subject to all laws of the state regulating the right of fishery. * * * While the right of fishery upon his own land is exclusively in the riparian proprietor, this does not imply or carry the right to destroy what he does not take. He does not own the fish in the stream. His right of property attaches only to those he reduces to actual possession, and he cannot lawfully kill or obstruct the free passage of those not taken. This right in the owner of the land must be regarded as qualified to a certain extent by the universal principle that all property is held subject to those general regulations which are necessary to the common good and general welfare, and to that extent it is subject to legislative control. It is a well-established principle that every person shall so use and enjoy his own property, however absolute and unqualified his title, that his use of it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the public. Hence, while the riparian owner has the exclusive right of fishery upon his own land, he must so exercise that right as not to injure others in the enjoyment of a similar right upon their lands upon the stream above and below.

In Stoughton v. Baker, 4 Mass. 522, 3 Am. Dec. 236, the court said: "But the right to build a dam for the use of a mill was under several implied limitations. One was to protect private rights by compelling him to make compensation to the owners of land above for, and damages occasioned by, overflowing their lands. Another was to protect the rights of the public to the fishery, so that the dam must be so constructed that the fish should not be interrupted in their passage up the river to cast their spawn. Therefore, every owner of a water mill or dam holds it on the condition, or perhaps under the limitation, that a sufficient and reasonable passageway shall be allowed for the fish. This limitation, being for the benefit of the public, is not extinguished by any inattention or neglect in compelling the owner to comply with it, for no laches can be imputed to the government, and against it no time runs so as to bar its rights."

In Commonwealth v. Essex Co., 13 Gray (Mass.) 249, Chief Justice Shaw uses this language: "It seems to be well settled that the obstruction of the passage of the annual migratory fish through the rivers and streams of the commonwealth is not an indictable offense at common law. But the right to have these fish pass up rivers and streams to the head waters thereof is a public right, and subject to regulation by the Legislature."

In Commonwealth v. Chapin, 5 Pick. (Mass.) 199, 16 Am. Dec. 386, the court held that: "In a river not navigable the proprietor of the adjoining soil has an exclusive right of fishery in front of his land to the thread of the river, except so far as this right has been qualified by legislative regulations. But this right is limited to the taking of fish, and does not carry with it a right to prevent the passage of fish to the lakes and ponds for the multiplication of the species."

The Supreme Court of the United States, in Holyoke Company v. Lyman, 15 Wall. 500, 21 L. Ed. 133, said: "Rivers, though not navigable even for boats or rafts, and even smaller streams of water, may be, and often are, regarded as public rights, subject to legislative control, as the means for creating power for operating mills and machines, or as the source for furnishing a valuable supply of fish, suitable for food and sustenance. Such water power is everywhere regarded as a public right, and fisheries of the kind, even in waters not navigable, are also so far public rights that the Legislature of the state may ordain and establish regulations to prevent obstructions to the passage of the fish, and to promote the usual and uninterrupted enjoyment of the right of the riparian owners."

In Parker v. People, 111 Ill. 581, 588, 53 Am. Rep. 643, the court said: "Belonging to all, common justice requires their preservation for the use and enjoyment of all. From the wild and wandering nature of fish they are not, nor can they be, the subject of ownership in running streams, like animals and fowls which have been domesticated. The nature of fish impels them periodically to pass up and down streams for breeding purposes, and in such streams no one, not even the owner of the soil over which the stream runs, owns the fish therein, or has the legal right to obstruct their passage up or down, for to do so would be to appropriate what belongs to all to his own individual use, which would be contrary to common right, and, all having a common and equal ownership, nothing short of legislative power can regulate and control the enjoyment of this common ownership. This must be so from absolute necessity. There is not, nor can there be, any other means of protecting each individual in the enjoyment of the rights his joint ownership confers, hence the necessity of legislative action to preserve and protect the rights of each and all in their common inheritance. Therefore the power of the Legislature to act must be admitted. The common law has always recognized the right of the riparian owner to take fish in the waters running over his own soil, and appropriate them to his own use, but, the fish being the common property of the people, such owner has never had the right to obstruct their passage from that portion of the river which flows over his land, nor has he the right to wantonly destroy the fish passing over it, and thus deprive the community of their right to and ownership in the fish, hence the manner in which, the time when, and the amount such riparian owner shall take, for the preservation of the common property, is a legislative and governmental function. Government was organized to protect the general and collective rights of the governed as fully as the individual rights of each member of the body politic, and this power, as we shall see, has been exercised as a legislative function by the British Parliament almost from the time of its organization, as well as by our state governments since their organizations."

In State of Iowa v. Beardsley, 108 Iowa, 396, 79 N. W. 138, the headnotes read as follows:

"Laws 17th Gen. Assem. p. 173, c. 188, which provided that the owner or owners of any dam or obstruction across any water course in this state shall within a reasonable time construct and maintain over and across said dam a fishway which will afford a free passage for fish up and down and through said water course, and that any dam not so provided within a reasonable time shall be abated as a public nuisance, is not, as to one who owns on both sides of a stream, and who has maintained a dam there for 23 years, unconstitutional, as depriving him of his property without due process of law; nor does such act constitute a taking of private property for public use without just compensation.

"The requirement by the Legislature that dams across streams shall be so constructed as not to interfere with the passage of fish is a legitimate exercise of the police power of the state.

"By maintaining a dam for 20 years the owner does not acquire a prescription right, as against the power of the state, to compel the erection of fishways."

It will be observed that there was no grant of the fisheries to the state, and that the statute of Iowa requiring the construction of fishways in dams. was in effect similar to that of New York state.

The case of West Point Power Co. v. Nebraska, 49 Neb. 218, 66 N. W. 6, holds that persons erecting and maintaining dams for milling purposes in the streams of that state do so with the implied obligation to maintain adequate fishways for the passage of fish from the lower to the higher level of such streams and their tributaries.

In State v. Theriault, 70 Vt. 617, 621, 41 Atl. 1030, 43 L. R. A. 290, 67 Am. St. Rep. 695, the court said: "The right to take fish from flowing waters, not boatable, in this state, pertains solely to the owner of the land through which such waters flow. It pertains to such owner personally, and is his private right; but he does not own such flowing water, and only has the right properly to use it while on its passage. He can use it in a reasonable manner for domestic purposes, for creating power, and for taking fish therefrom. He must not divert it from its course, nor pollute it, but leave it so that the landowners on the stream above and below him can enjoy their full like use of the water, and, among these, the right to take fish from the stream. This right implies and carries with it the common right to have fish inhabit and spawn in the stream. For this purpose they must have a common passageway to and from their spawning and feeding grounds. Fish themselves are feræ naturæ, the common property of the public, or of the state, in this country. From this common property the owner of the soil over which the nonboatable stream flows has the right to appropriate such as he may capture and retain; but this right of capture and appropriation is subject to regulation and control by the representatives of the people, so that there shall continue to be a common property. The preservation of the common property, and its increase by the introduction of new and better species of fish, is not a taking away of the right of the owner of the land on the stream to appropriate therefrom, but a preservation or enlargement of such right. The state, the representative of the people, the common owner of all things feræ naturæ, not only has the right, but is under a duty, to preserve and increase such common property."

In State v. Franklin Falls Co., 49 N. H. 240, 6 Am. Rep. 513, it was held that the maintenance of dams without fishways in an unnavigable river which is the outlet to a large inlet lake, thereby obstructing the passage of migratory fish from the sea to the lake, constitutes an indictable offense at common law, and that no right will be acquired as against the state by the obstruction of a public fishway, though continued for more than 20 years under a claim of right, if such obstruction in fact originated without right.

Many other decisions in these and other states of the Union might be cited to the same effect.

Not only has the Legislature the right to protect and regulate the easements of the right of an unobstructed navigation of the streams of the state, and of the right of an unobstructed passage of fish through such waters, but it has also the right to prohibit and regulate the taking of fish therefrom, and even from private waters within the state, and the discharge into the streams of substances harmful to fish, and such power has been frequently exercised, and such exercise repeatedly held to be constitutional and valid.

The petitioner alleges that the dam of the Deposit Electric Company having been, as it claims, lawfully constructed under authority of the Legislature (chapter 142, p. 155, Laws 1828), cannot now be interfered with, and the electric company compelled to put in a fishway, and that the provisions of the forest, fish, and game law in that regard are unconstitutional, and the petitioner quotes from the opinion in the case of Chenango Bridge Company v. Paige, 83 N. Y. 185, 38 Am. Rep. 407, in support of his contention.

Many of the decisions of this and other states heretofore cited uphold the constitutionality of the forest, fish, and game law. Every presumption is in favor of the constitutionality of a statute, and, to justify the court in pronouncing it unconstitutional, it must be made to appear that, when fairly and reasonably construed, it is in clear and substantial conflict with some provision of the Constitution. Sweet v. Syracuse. 129 N. Y. 316, 27 N. E. 1081, 29 N. E. 289.

It is to be observed that the act of 1828 authorized the construction of a dam not exceeding 24 inches in height above low-water level, instead of more than twice that height as now constructed, with such a sluiceway as should

render the passage of boats, arks, and rafts safe and easy, and which, having only one-half the elevation of the fishway required by the order of the commissioner, might perhaps of itself have provided an efficient fishway; and that the second section of the act expressly provided that the act and everything therein contained should be deemed to be taken subject to the right of the Legislature at any time thereafter to modify, alter, or repeal at pleasure. Furthermore, the right of the unobstructed passage of fish through the waters of the river, constituting an easement, was not one of the questions before the court for decision in the Chenango Bridge Case, and was not considered, but the decision is an authority for the right of the Legislature to make laws regulating, preserving, and protecting every public easement. There is nothing in the act of 1828 by which the Legislature released the easement relating to fish inhabiting the waters of the West branch of the Delaware river, and no express reservation of the right was necessary. It has long been settled law that such effect will not be presumed, and that it cannot result by implication, but that the language effecting such release must be clear and unequivocal. Enforcing the easement relating to fish, and requiring the petitioner to put in a fishway as in effect a condition of maintaining its dam, is not the taking of private property without making just compensation, as the petitioner cannot be deprived of a right which it never possessed. The fact that moneys were contributed by the state, pursuant to an appropriation made by the Legislature in 1902 for the construction of a fishway in this dam, in no way relieves the electric company from liability for the construction of subsequent fishways.

The second question to be considered is whether such order made by the Forest, Fish, and Game Commissioner was a reasonable exercise of power. The chute ordered by him seems to correspond closely to the plans of the said fishway prepared by the State Engineer and Surveyor in 1902, and there is nothing in the motion papers criticising the plan of the fishway so ordered, or suggesting any modification thereof in the interest of economy or efficiency. From the affidavits filed at the time of the hearing of this motion, as well as those filed at this time, both by the petitioner, the Deposit Electric Company, and the respondent, the Forest, Fish, and Game Commissioner, it appears that, with the exception of trout, the various kinds of fish inhabiting this river spawn between the 1st day of March and the middle of June, the last to spawn being black bass, as to which the statutory season for catching opens June 16th. As to trout which spawn in the fall, it satisfactorily appears that while they are found some miles north of the Stilesville dam in narrower portions of the river, and in increasing numbers toward the head of the stream, yet that they are so seldom found in this portion of the river as to make the season of their spawning a matter of not serious consideration. It would therefore seem that the interests of the public in the propagation of fish would be fully conserved by requiring an open fishway in the dam to be maintained from March 1st to June 16th in each year. This would allow the electric company the full use of the waters of the river during the periods of the greatest drought, and also allow closing and protecting the fishway from destruction during the periods of the running ice. Should the public interests at some future time require a more extended period of an open fishway by reason of the introduction of other varieties of fish, or for other reasons, proceedings for a modificaion of the order can be taken. While private interests should not be allowed to infringe upon public rights, public rights should not be allowed to unnecessarily abridge vested private interests.

In view of all the circumstances, I think that a modification of two clauses of the order so as to read, "The mouth of the chute where it connects with the dam must in no wise be obstructed, between the 1st day of March and the 16th day of June in any year, nor slash boards be put on top of or above the mouth of the chute during such times," and "the top of such chutes must remain wholly open and uncovered excepting during such three and one-half months," is reasonably required, and the order is therefore modified accordingly, and, as modified, affirmed.

Argued before SMITH, P. J., and CHESTER, KELLOGG, COCHRANE, and SEWELL, JJ.

E. D. Cumming (C. L. Andrus, of counsel), for appellant.

Neish, More & Neish (Alexander Neish, of counsel), for respondent Whipple.

PER CURIAM. Order modified by striking out the word "excepting" in the last clause thereof, which has apparently been inserted therein by inadvertence, and, as so modified, affirmed, with costs, upon the opinion of the court at Special Term.

---

### GUBNER v. McCLELLAN, Mayor, et al.

(Supreme Court, Appellate Division, First Department. March 12, 1909.)

1. STATUTES (§ 105*)—SUBJECTS AND TITLES OF ACTS.

Const. art. 3, § 16, providing that no private or local bill shall embrace more than one subject, which shall be expressed in the title, was designed to prevent the grouping of separate matters in a single local or private bill, and to prevent the title misleading the Legislature and the public.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 117; Dec. Dig. § 105.*]

2. STATUTES (§ 77*)—"LOCAL ACT."

A "local act" is one confined to a particular municipality or particular part of the state.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 79; Dec. Dig. § 77.*

For other definitions, see Words and Phrases, vol, 5. pp. 4208–4213.]

3. STATUTES (§ 77*)—"PRIVATE BILL."

A "private bill" applies only to individuals or corporations, and not to municipalities.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 79; Dec. Dig. § 77.*

For other definitions, see Words and Phrases, vol. 6, pp. 5567–5569.]

4. STATUTES (§ 106*)—SEVERAL SUBJECTS—GENERAL LAW.

There is no constitutional objection to embracing several separate matters in a general, as distinguished from a private or local, bill.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 119, 120; Dec. Dig. § 106.*]

5. STATUTES (§ 106*)—NATURE—GENERAL LAWS—TITLE.

Public Service Commissions laws (Laws 1907, p. 889, c. 429), creating commissions to regulate certain public service corporations is a general, and not a local or private, act, and hence is not within Const. art. 3, § 16, providing that no local or private act shall embrace more than one subject, etc.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 119, 120; Dec. Dig. § 106.*]

6. STATUTES (§ 107*)—PLURALITY OF SUBJECTS—"LOCAL ACT."

An act providing for the accomplishment of an object and providing means for payment therefor does not contain two subjects, and hence the provision of the Public Service Commissions law (Laws 1907, p. 889, c. 429) for payment of salaries and expenses of the commission for the First district by New York City does not constitute a local act joined with general legislation, within Const. art. 3, § 16, providing that no local act

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes