THE PEOPLE OF THE STATE OF NEW YORK ex rel. NEW YORK, ONTARIO AND WESTERN RAILWAY COMPANY *v.* THE STATE TAX COMMISSION.

(Supreme Court, Albany County, July, 1921.)

*Taxation — certiorari to review assessment of special franchise for bridge crossing the Susquehanna river at a certain point — test of navigability of rivers — Susquehanna river in 1801 was a public highway — Tax Law, § 2(7) — tax annulled and amount paid thereon refunded, with interest.*

CERTIORARI proceedings to review assessment.

William H. Sullivan, for relator.

Charles D. Newton, attorney-general, by B. C. Turner, deputy attorney-general, for state tax commission.

Charles C. Flaesch, for town of Unadilla.

Sewell & France, for town of Sidney.

LYON, Official Referee. In the year 1919 the state tax commission assessed for special franchise the

bridge owned and used by the New York, Ontario and Western Railway Company, crossing the Susquehanna river between the towns of Sidney, Delaware county, N. Y., and Unadilla, Otsego county, N. Y. The railway company claiming such assessment to be void, instituted these proceedings by certiorari to review the same.

By section 34 of chapter 186 of the Laws of 1801, the legislature of the state declared the outlet of Otsego lake, and all such parts of the Susquehanna river as are contained within this state, to be public highways, except so much of the waters as might be necessary for the owners of the adjoining land to build storehouses and docks for the accommodation of boats, provided the same should not obstruct the navigation of said stream.

The test of navigability in law, is navigability in fact. Rivers are navigable in fact when they are used or are susceptible of being used in their ordinary condition by the public as highways of commerce. The servitude of privately owned lands forming the banks and bed of a stream to the interest of navigation is a natural servitude confined to such streams as in their ordinary and natural condition are navigable in fact. *United States* v. *Crest*, 243 U. S. 316, 323. The public right on a stream is the right of travel as on a public highway. The easement pertains to the sovereignty of the state; is inalienable, and gives to the public the right to use the stream for the purposes of navigation only.

The Chenango river is a fresh water stream. It is therefore a private river. As early as 1798 it was declared a public highway, but subject to the public easement for the purpose of navigation. The riparian owners might make such use of the river as they pleased, might bridge it and dam it except as prohibited by the legislature, and might cross it with

ferries except as so forbidden. *Chenango Bridge Co. v. Binghamton Bridge Co.,* 26 How. Pr. 124, 131. The legislature, except under the power of eminent domain upon making compensation, can interfere with such streams only for the purpose of regulating, preserving and protecting the public easement. Further than that it has no more power over fresh water streams than over private property. It may make laws regulating booms, dams, ferries and bridges, only so far as is necessary to protect and preserve the public easement, and when it goes further it invades private rights protected under the Constitution. *Chenango Bridge Co. v. Paige,* 83 N. Y. 178.

It is not necessary that in order to be navigable the river should be deep enough to admit the passage of boats at all portions of the stream. *Danes v. State of New York,* 219 N. Y. 67, 71; *St. Anthony Falls Water Power Co. v. St. Paul Water Commissioners,* 168 U. S. 349. A river is in fact navigable on which boats, lighters or rafts may be floated to market. *Matter of Deposit Fishway,* 131 App. Div. 403, 412. The capacity to float logs, singly or together, to run rafts however small, gives to all the public this easement, the right to use and navigate. *Buffalo Pipe Line Co. v. New York, Lake Erie & Western R. R.* (Barker, J.), 10 Abb. N. C. 107, 111. The legislature has the right to declare as a public highway a navigable river. *Smith v. City of Rochester,* 92 N. Y. 463, 485. The Otselic river was declared to be a public highway April 12, 1813, 2 R. L. 286. No individual, therefore, had a right to obstruct it by dams or other erections without a grant from the legislature. The right of the legislature to make such a grant is too clear to be disputed. *Crittenden v. Wilson,* 5 Cow. 165.

Every presumption is in favor of the constitutionality of a statute. *Sweet v. City of Syracuse,* 129 N. Y. 316; *Dartmouth College v. Woodward,* 4 Wheat.

518. Courts should be careful not to declare legislative acts unconstitutional upon agreed and general statements and without the fullest disclosure of all material facts. *Chicago & Grand Trunk Railway Co.* v. *Wellman,* 143 U. S. 339. It is the duty of the court to uphold a statute enacted by the legislature as constitutional if it is possible to do so without disregarding the plain command, a necessary implication of the fundamental law. *N. Y. C. & H. R. R. R. Co.* v. *Williams,* 199 N. Y. 108.

The record is silent as to the natural condition of the river at the time of the passage of the act of 1801. In the year 1779, General Clinton confined the waters of Otsego lake, and breaking away the dam floated his transports down the river. The record discloses that even after the railroad was built alongside the river and before the advent of the automobile, houseboats would frequently come down the river in an ordinary condition of the water. One witness states the number at possibly fifty in one year. The witness describes two of the boats as built " on the scow pattern, and a big top on them." Fleets of boats and canoes came down from which the occupants would camp out overnight, or become guests of hotels along the river. Cooperstown was settled very early. The cutting down of the forests and clearing of the land has done away with the floating of rafts. In 1811 the legislature authorized the construction of the Phoenix Cotton Mill dam about three miles from the outlet of Otsego lake, making provision for the construction of locks for passage of boats up and down the river. Since then many other acts have been passed authorizing the construction of dams in the Susquehanna river. The large dams at Colliers, Oneonta, and between Unadilla and Otsego, for the generation of electric light and power, are among the more modern constructions.

The rule is that a state legislature has the power to appropriate by force of its own enactment any flowing stream to the use of the public as a highway, subject, however, to the qualification that if a stream is in fact not navigable, a statute declaring it to be navigable will not make it so in law as against the pre-existing rights of riparian owners, unless compensation is made to such owners for the value of the rights so destroyed or injured. 27 R. C. L. Waters, § 216, p. 1307.

The conclusion is, that in 1801 the Susquehanna river was navigable from the outlet of Otsego lake throughout its whole course. It was, therefore, a public highway and the legislature had the right to declare it such without making compensation to the owners of property along its banks.

However, another question arises in the case. Subdivision 7, section 2 of the Tax Law provides: " The term ' special franchise ' shall not be deemed to include the crossing of a street, highway or public place outside the limits of a city or incorporated village where such crossing is less than 250 feet in length, unless such crossing be the continuation of an occupancy of another street, highway or public place. This subdivision shall not apply to any elevated railroad.''

Concededly, such crossing is not the continuation of an occupancy of another street, highway or public place. The distance between the abutments of the bridge is 302 feet. The space under the bridge between the vegetation line on the south side of the river and the marks made upon the stone riprap by the current on the north side, measured along the center line of the bridge as indicating the normal high water mark, is 242 feet. Measurements of the width of the river were made every two weeks between July 30, 1919, and May 3, 1920, excepting from December 15, 1919, to April 1, 1920, while ice was on the river.

Only once during this time was the width of the river 250 feet, and that when the spring freshet filled the space between the abutments, and submerged the adjoining meadows. The width of the water was as low as 113 feet. The measurement of the space between the vegetation lines should control the length of the crossing rather than the measurement of the space between the abutments, which are required to be built sufficiently far apart to prevent the water choking the channel in time of freshets. As an illustration, the Lyon Brook bridge near Oxford, N. Y., on the line of relator's railroad, is 800 feet in length while the stream it crosses is about two rods in width, and the highway about three rods.

One other fact should be noted, that the assessments of the bridge are divided between the tax districts of the town of Unadilla, Otsego county, and the town of Sidney, Delaware county. The instructions issued by the bureau of special franchises state that the assessment need not be reported unless the length of such bridges measured at normal high water mark is 250 feet, or more, in a single tax district.

The determination of the state tax commission should be annulled, and the amount of the tax paid refunded with interest, with costs to relator.

Ordered accordingly.